# HOWELL v. SCHNEIDER.

---

LANDLORD AND TENANT; LEASE; PAROL EVIDENCE; WARRANTY; NOTICE.

1. There is no implied warranty in the letting of a house that it is safe and fit for occupation, and, in the absence of an express warranty, the rule of *caveat emptor* applies; and it is for the lessee to make the examination necessary to determine whether the premises are in safe condition and adapted to the purpose of his occupation.

2. Even if parol evidence is admissible to show an agreement to make repairs in an action by a tenant against his landlord to recover damages for personal injuries resulting from a failure to make repairs, where a written lease, subsequently accepted, contains no covenant to repair, such parol agreement to repair will not be given the effect of a special warranty covering, not only the specific repairs promised to be made, but also the complete safety of the premises in other respects.

3. While the failure of a landlord to reveal dangerous conditions of the premises may not constitute actual fraud or misrepresentation, it may in a particular case amount to such culpable negligence of duty as to afford ground for action by the tenant against the landlord in case the tenant sustains injury therefrom.

4. No action will lie by a tenant against a landlord on account of the defective condition of the premises, in the absence of an express warranty, or of active deceit. The mere fact. that a careful inspection of the premises by the landlord would have disclosed the defect

is not sufficient. The tenant is charged with that duty on his own behalf.

5. The trial court properly directs a verdict for the defendant in an action by a tenant against her landlord to recover damages for personal injuries received by the falling of a flush tank in the water closet of the leased premises, in the absence of any special warranty in the lease, where it appears that the tank had been substituted for one of older and different construction two years before at the request of a former tenant, and had been used with safety by him and the members of his household; that the unskilful manner of its attachment to the wall was concealed from view, and nothing had called the landlord's attention to it; that, while it had become slightly detached from the wall, such condition was not known to the landlord; and that the defect was not discovered by the tenant until she was injured; and that her family used the closet constantly for more than a week without its discovery.

6. Under such circumstances, there is no room for the application of the principle that knowledge may not only be direct and complete, but may consist, also, of the knowledge of facts that, under the surrounding circumstances, would reasonably and justly put one upon inquiry.

. No. 1371. Submitted December 7, 1904. Decided February 7, 1905.

HEARING on an appeal by the plaintiffs from a judgment of the Supreme Court of the District of Columbia upon a verdict directed by the court in an action to recover damages for personal injuries. *Affirmed.*

The COURT in the opinion stated the case as follows:

The appellants, Frank A. Howell and his wife, Maggie A. Howell, brought this action against Ferdinand T. Schneider and Jane Schneider, individually, and as executors of the estate of Louis H. Schneider, deceased, and against David Moore, and William A. Hill, partners, under the name of Moore & Hill, to recover damages for serious injuries sustained by said Maggie A. Howell through the fall of a water box or flush tank in the closet of a house occupied by the plaintiffs as lessees of the defendants.

The declaration alleged the lease of the house from the de-

fendants, Ferdinand T. and Jane Schneider, acting through their agents, Moore & Hill, for a term beginning July 1, 1900; that defendants agreed with plaintiffs to have the house put in thorough repair and in safe and habitable condition before the latter should remove to it, and it thereby became their duty to use reasonable care and skill in putting the same in safe and habitable condition, and to make all necessary inspections to ascertain what work and skill would be necessary to accomplish that end; that part of the rent was paid in advance, and plaintiffs, believing, from the assurances of defendants, that the house had been properly repaired and put in safe condition, took possession of the same and removed thereto with their family on July 9, 1900; that on July 18, 1900, the said Maggie A. Howell, being then a healthy, strong woman of thirty-eight years of age, was in the bath room, when, without fault or negligence on her part, the water box or flush tank, by reason of the negligent and unskilful manner in which it had been fastened and supported, fell upon her and injured her seriously.

The death of Jane Schneider pending the suit was suggested.

The first witness for the plaintiffs, Maggie A. Howell, testified as follows:

That she is the wife of Frank A. Howell, and that in June, 1900, she saw the sign, "For rent, by Moore & Hill," in the window of the house 806 Eleventh street northwest, and that between the 10th and 18th of the same month, as agent for her husband, she called on the firm and had a talk with Mr. Moore in regard to the house, and was informed that the present tenants would vacate on the 18th, and that on that date she went through the house with her husband, while the Milhollands were moving out; and that on the same day, after they had gone through the house, she again went, as agent for her husband, to the office of Moore & Hill, and told Mr. Hill they would rent the house if it was put in thorough repair, and that he said he would consult the owner and let her know; that she went to Moore & Hill's office again on the 19th, and was informed by Mr. Moore that the house had been rented to another party; that on the 20th she again called at their office, and Mr. Moore

informed her that the party who had rented the house had de-
cided not to take it; that Mr. Moore then gave her the key, and
she went through the house alone, and observed that it needed
painting and papering and was in a very bad condition, which
Mr. Moore admitted; that she returned the key to Mr. Moore
the same day, and told him she would take the house if it was
put in thorough repair, and that he told her the house would be
put in thorough repair, and asked her to make a deposit of $10,
which she did; that nothing was said at this interview by Mr.
Moore as to having seen the owner,—he simply said that the
house would be put in thorough repair; that no lease was signed
until after they moved into the house; that she did not want the
house until the 5th of July, as her time was not up until then at
the house they were then occupying, but Mr. Moore said the
rent must commence on the 1st of July; that she had another
interview with Mr. Moore just prior to the 1st of July, and he
told her that the house would not be ready for her on the 1st be-
cause the repairs had not been finished; that she told him she
had made all arrangements to move, and would be very much
inconvenienced unless she could get the house on the 1st of the
month, but he said she could not have it; that she then asked to
have one room on the 1st for a tenant who was to move in with
them, and he said he would ask the owner and let her know;
that Mr. Schneider was present at this interview, and was stand-
ing on the outside of the railing very close to her, Mr. Moore
standing on the inside of the railing; that Mr. Schneider was
not talking to anyone at the time, and took no part in the con-
versation between herself and Mr. Moore; that she did not know
him at the time; that he was present when the statement was
made by Mr. Moore that the repairs were not finished; that she
did not receive permission to move this tenant into the room or
to occupy any portion of the house until the repairs were com-
pleted; that on Friday, July 6th, she saw Mr. Moore, and he
told her the repairs were now finished, and they could move in
any time, and she told him they would move in Monday, and
he said very well; that they did move in on Monday, the 9th;
that nobody at all was working there when they moved in, and

the repairs were apparently completed; that no work at all was
done on the house after they moved in, inside or outside, except
a small place in the basement repaired by a carpenter; that on
July 18, in the forenoon, while on her knees wiping up the bath
room floor, the flush tank fell and struck her on the back; that
the water was pouring out of the flush tank, and she thought the
house would be flooded, and she managed to get down to the
basement, where two men were fixing the range, holloing while
she was going down stairs to turn off the water; that she fainted
when she got to the basement, and was afterwards placed on a
chair by the two men and carried upstairs; that she again lost
consciousness, and when she came to, Drs. Heinicke and Ma-
chinek were working over her; that she was confined to her
room and the hall for three months, and was constantly on her
bed and couch during this time; that her entire left side was
paralyzed, her arm was dislocated, and her spine injured, and
she was helpless during that time, that she was confined to the
house for twenty-two months and during this time was in con-
stant pain, night and day; that before the accident her health
was perfect, but she has never been free from nervousness or
pain since, and has been under the care of physicians since;
that before the accident she was in the millinery business and
also attended to her household duties, but has been entirely un-
able to work ever since the accident; that the paralytic condi-
tion has not disappeared; that her eyesight before the accident
was perfect, but now is very much impaired, and she is com-
pelled to wear glasses; that her left arm has not been any use to
her since the accident; that it has a numb feeling all the time,
and she cannot use it to work or to do anything; that the two
Merricks, two ladies, and a Mr. Smith moved into the house
with them, and occupied rooms in the house up to the time of
the accident, all using the bath room; that she never noticed
any defective condition of the flush tank prior to the accident;
that the bath room is very small and very dark, having but one
window, opening on an areaway between that and the adjoining
house; that the wall of the next house is close to the window,
and extends further back than their house, making the bath

room very dark; that the areaway is closed in front and no light can get in from the front; that the window of the bath room is directly opposite the door, and the flush tank is in a dark corner of the room, near to, but above, the window; that the bath room was painted a dark brown, making it darker than it otherwise would have been; that the flush tank was also painted brown, but of a shade lighter than the walls; that she had used the bath room frequently prior to the accident, but had never observed anything wrong; that the walls and the window casings and sills in the bath room had been painted, but she did not know whether the flush tank had been painted or not; that one day during the week they moved into the house Mr. Schneider came to the house and said he wanted to examine the repairs, and that he went all through the house; that he went to the bath-room door and looked in.

On cross-examination the witness gave evidence tending to prove that in the first interview with Moore & Hill, with reference to repairs, she did not specify certain repairs which she desired made; that on the 20th of June she called and requested Mr. Moore to have the hall papered, the back porch repaired, and the house painted and cleaned out; that they still live in the house where the accident occurred; that Mr. Moore was the first person she spoke to about the repairs, and he told her he would consult the owner and see if the repairs would be made; that she did not ask that the kitchen be painted, or that the front doorstep be fixed, or that two lights of glass be put in, or that the papering in the dining room be patched or repaired; that after they moved in she asked to have some new sash cords put in the parlor window, and asked that some spigots and gas jets be repaired; that she never asked to have four panes of glass put in the kitchen windows, but these were all right when they moved in; that she did not ask to have a pane of glass put in the front of the cellar door, or a pane put in the third-floor-front room, or to have a brace put under the front steps; that after they moved in she reported to Moore & Hill that the kitchen range would not draw; that she was at the house several times between the 18th of June and the time they moved in, and saw

papering and painting of woodwork being done, but saw no carpenters there and saw no work being done on the outside of the house; that she told Mr. Moore the house was very much in need of papering and painting, and he asked her what rooms she wanted papered, and she told him she would like to have the parlors papered and the halls and some of the rooms upstairs and the dining room downstairs; that he told her the owner would not paper the hall and the parlors, too,—that he would paper the parlors, but not the hall; and she said, "Well, the hall is in a very bad condition, and if he won't do both I would prefer having the hall papered;" that the house generally did not need papering,—that there were several rooms in good condition; that she cannot recall any other specific thing she asked to have done other than those mentioned,—that she asked to have the house put in thorough repair; that five persons besides herself and husband and their two children moved into the house with them and remained until after the accident; that there was no other bath room or closet in the house, but there was, a closet in the yard for the use of the servant; that everything was clean and in very nice condition when they moved in; that all the persons in the house used this bath room; that all the waste water, etc., from the rooms was poured into the closet; that there were nine persons, including two children aged respectively thirteen and seventeen, in the house who used the closet; that she had used the bath room the day of the accident; that on the morning of the day they moved she called at the office of Moore and Hill, and asked for the key, and was told the paper hanger was at the house and had the key; that the paper hanger had the house open, and she got the key from him; that he told her he would be through in a short while; that she never had any conversation at all with Mr. Schneider in regard to the house; that Mr. Schneider took no part in the conversation between herself and Mr. Moore the morning she inquired about one of the rooms; that he couldn't help hearing the conversation,—he was close enough to hear it; that the conversation that morning was confined to a request to let one tenant move in; that Mr. Schneider called alone one day during the week they moved in,

and said he wanted to go through the house to see the repairs; that he did not say he was the owner; that she recognized him as being the same gentleman she had seen in Moore & Hill's office, and thought he was Mr. Hill; that she did not go through the house with him; that she saw him at the bath-room door; that he went into another room, and spoke of some boards that had been put up to form a clothes closet, and was very much displeased about that; that she had no conversation with him, and did not ask him to have anything done or make any complaint to him as to the condition of the house; that she observed nothing wrong with the house at any time before the accident; that she cannot say whether the things asked to be done after they moved in were requested before or after Mr. Schneider's visit; that his attention was not at any time called to the condition of the flush tank, and that so far as she knew it was all right up to the time of the accident; that it seemed all right to her; that it was worked by pulling a chain.

On redirect examination the witness gave evidence tending to prove that in the conversation with Mr. Moore in regard to repairs she did not undertake to specify all the things that would have to be done to put the house in thorough repair; that he said it would be put in thorough repair; that she called his attention to the painting and papering.

Frank A. Howell, a witness next called on behalf of the plaintiff, gave evidence tending to prove that he is the husband of the female plaintiff, and is employed in the department of justice; that they saw the sign, "For rent, by Moore & Hill," in the house No. 806 Eleventh street northwest, and that some time in June, 1900, he and his wife made an examination of the house, and found that the paper was soiled and dirty, the porch was in a dilapidated condition, all the wood work needed painting, and the house was in bad repair generally; that after examining the house he authorized his wife to see Moore & Hill and rent the house if they would put it in thorough repair; that he assisted in moving in in the afternoon of July 9, 1900, and that no repair work was then going on in the house, and there were no workmen at all there; that everything appeared to be in good

repair when they moved in, and that he saw nothing wrong; that the two Merricks, C. C. Smith, Miss McAuliffe, and Miss Murphy moved into the house with them; that there is no other bath room or closet in the house but the one on the second floor, but there is a closet in the yard for the use of the servant; that the walls of the bath room are of plaster and had been painted a very dark brown, and the woodwork of the bath room had also been painted, but did not think the flush tank had been; that the flush tank is a cherry color, much lighter than the color of the walls; that the bath room is very small and dark, containing one window situated opposite the door; that this window opens upon an area way between their house and the adjoining one; that the wall of the adjoining house is of red brick, and is 5 or 6 feet from their wall; that the adjoining house runs up one story higher than theirs, and extends 6 or 8 feet farther back; that the area way upon which the window faces is closed in the front by their house; that the flush tank is in one corner of the room above the highest point of the window; that he got home just before 12 o'clock, July 18, 1900, and found Mrs. Howell unconscious and Drs. Machinek and Heinecke working over her; that after she had become quiet he examined the bath room and then locked it and reported the matter to the plumber's office; that the flush tank was detached from the wall but was still attached to a large lead pipe, which was bent over, and the tank was suspended by this pipe about 6 to 10 inches from the floor; that this pipe was still attached to the wall just below the wainscoting; that the flush tank was fastened to three boards against the wall,—a long upright board and two wings at the top; that the center board or flush board ran down flush with the wall, and was let into the wainscoting below, and at the top on each side of this flush board are two other boards, forming a sort of wings, making it wide enough to hold the flush tank, and on these three boards the flush tank was fastened; that across the top of the flush tank was nailed a narrow strip which was also nailed to the boards to hold them together; that these boards were all loose from the wall, and fell with the flush tank to the floor, and were still fastened to the tank; that the flush tank

was about 2 or 2½ feet long, about 12 or 15 inches high, and extended at right angles from the wall about 1½ feet; that in the wall behind where the flush board had been, and about midway between the flush tank and wainscoting, he discovered a wooden plug about ¾ of an inch in circumference, driven in between the bricks of the wall; that there had been driven through the board into this plug three smooth wire nails, about 3½ inches long, splitting the plug all to pieces; under the right wing board, still in the wall, was another wooden plug about ¾ of an inch in circumference driven in between the bricks, into which wire nails of the same size had been driven, and which was all split; that under the left wing board he found a hole, and afterwards found a paper plug under the bath tub, which he fitted into this hole; that he picked this paper plug up and fitted it into the wall, and then placed the board against the wall just as it was before it fell; that this paper plug was even with the wall, and was only partly behind the wing board; that part of it was outside and had been painted over, and part was covered by the wing board; that there was no wooden plug at all in this space, and this paper plug was the only fastening to that side of the tank; that a nail had been driven into the paper plug, which had pulled out and was still in the wing board; that this was all he found to hold the box to the wall; that there were no hooks to hold the tank to the wall and no brackets under it; that the boards were about 1 inch thick; that the bath room remained in the same condition two or three days; that he received two or three postal cards from Moore & Hill, which he had searched for, but cannot find; that the first contained a request that Mrs. Howell should call to see them with reference to 806 Eleventh street; that the next was a notice that we would not be able to get the house by the 1st of July, as the repairs would not be completed in that time; that the next was that the owner would not allow us to occupy any part of the premises until they were thoroughly repaired and inspected; that these cards were all signed by Moore & Hill, and were all received before they moved into the house; that Mrs. Howell's health was perfect

before the accident,·but she has been able to do very little work since; that she was confined to her bed two or three months after the accident and did not go out of the house for a long time,—over a year; that she never wore glasses before the accident, but has worn them since; that ·she never used to suffer from nervousness, but is very nervous now.

On cross-examination the witness gave evidence tending to prove that there were three boards connected with the flush tank,—one center piece and two side pieces; that he thinks the center piece went to the top of the tank, and that the whole thing was together when he saw it; that there was no board across the bottom of the tank for it to rest on, and that nothing supported the tank but its connection with the center board; that he never saw the paper plug before the accident; that there were no cleats over the top of the back part of the tank board, and fastened to the wall; that if there were any he did not see them; that he examined very carefully, and the side board and tank board and tank were all together when he first saw them; that it never occurred to him before the accident to examine to see how the tank was supported, because in the last house he had lived in he often had to fix the valve, and would pull himself up by the edge of the tank, and he naturally supposed they were all made alike; that he never pulled himself up by the edge of this tank before the accident; that opposite the closet is a stationary washstand in the corner, and along this wall there was a looking glass and gas jet, and neither of these was broken; that the bath tub, closet, and tank could be seen when one entered the room; that witness had used the bath room constantly, and noticed nothing wrong about it; that everybody in the house used it; that he had not noticed anything wrong with the flush tank; that both pipes were still attached to the centerboard when he first saw it, and that there were nails driven through this board about the middle; that he thinks the small pipe only was connected with the centerboard by little cleats, and does not think the larger pipe was connected with the centerboard; that he went to the house with his wife to look at it before it was repaired, and that he went there the morning before they moved

and looked through it, and apparently everything was satisfactory; that after they moved in he discovered that he could not raise the parlor window, and immediately sent for a carpenter to raise it; that the back porch had been primed before they moved in, and a few days after they moved in a painter came and painted it; that he made no request about painting the porch; that a day or two after they moved in he noticed there was a brace off the front iron steps, which he reported two or three times; that he made no other request for repairs that he knows of; that when anything occurred in the house that needed repairs, he reported it to Moore & Hill, and they had it done; that on Sunday after they moved in they discovered that the kitchen range would not draw, and he reported it to Moore & Hill and they had it fixed; that he thinks they asked Mr. Moore to put a glass door in the dining room, but they did not do it; that he signed the lease for 806 Eleventh street about a week after they moved in; that as to arrangement of walls, area in rear, and darkness of bath room, the house when they moved in it was constructed the same as when he first inspected it; that when he first looked at the house it needed thorough repair; that the back porch was in a dilapidated condition; that the paint was all dirty and dingy, and the woodwork and the halls were all dirty; that the hall, as well as some of the rooms, was very much soiled, that others were in good repair, but all needed painting; that there was a hole in the floor in the basement hall; that the back porch was repaired and the papering and painting done, and the floor in the basement repaired; that he doesn't know of any other defect that was noticed that was not repaired; that when they moved in everything was satisfactory to all appearances; that when he examined the house before moving in he looked at the tub and saw that it was a nice-looking one, and the seat and box looked new; that he had no objection to it,—had nothing to say about it at all.

On redirect examination the witness gave evidence tending to prove that the kitchen range was not in process of repair when they moved in; that after they moved in they discovered it would not draw, and reported it, and it was attended to.

Charles C. Wood testified that he was employed by Jesse Mann to work in painting the house from June 28 to July 6, 1900; that he returned on July 18 to paint the back porch and reglaze the front sash; that he used the closet on the 28th or 29th of June, and in flushing the tank a few drops of water fell on his head; that he examined the tank and found that it projected from the wall at the top from ½ inch to 1 inch, but the bottom was flush with the wall; that the bath room is small, has but one window, and is poorly lighted; that he called the attention of Miles and Winkleman to the tank, who were also in the employ of Mann, the contracting painter; that they had nothing to do but the painting; that witness varnished the window of the bath room two or three days after; that he did not mention the dangerous condition to anyone else; that Mr. Schneider came to the house occasionally while the work was going on; that looking right at the flush tank one could not detect the defect, but sighting with the wall from the bath tub one could see the plugs distinctly as they had drawn out from the wall; that the plugs were partially drawn; that in the holes in which the plugs had been driven the plaster had broken and enlarged the holes, which caused the plugs to work loose. Charles H. Winkleman corroborated Wood as to the condition, and said that he had been in the bath room before, but did not notice the condition of the tank until his attention had been called to it.

George H. Miles, another painter, agreed with Wood as to the condition, and said that, if it had not been called to his attention, he would not have seen it, but that he could see it distinctly after his attention had been called; that the bath room was a dark one. John H. Milholland testified that he had occupied the house from the spring of 1898 to the 18th of June, 1900; that there was first an old-fashioned box closet with a knob to raise; that he made complaint of the closet and the owner put in a new one and a new bath tub in the fall of 1898; that the room was then painted; that he made complaint that the closet did not flush properly, and Mr. Schneider said he would lose his tenant before he would go to more expense; that

he did not leave because of this refusal; that he did not do anything with the tank, and did not insert the paper plug.

Richard A. O'Brien, a witness for plaintiff, an assistant inspector of plumbing, explained the most approved mode of supporting tanks by brackets or hooks. He explained the dangers of plug construction, although it is in use to a great extent, and is safe if carefully done, but there is no way to tell whether it has been carefully done. He said that if two thirds of the plugs in this instance had been split it would indicate that the workmen had been careless in fastening the board to the wall, and if all the nails had pulled out of the plugs it would indicate that proper nails had not been used.

Charles H. Ball, a former inspector of plumbing for the District of Columbia, said that he examined the water box soon after the accident; that it had fallen and rested on the closet fixture; that the board supports were detached from the wall; that the bent flush pipe was of lead; that the tank held 3 or 4 gallons of water, and, with the water, would weigh 250 pounds; that the board to which it had been attached on the wall had been secured by two or three nails, the hold of which in the wall would be about 7/8 of an inch; that the tank was intended to clasp by a hook over the top of this board, and would hold as long as the board remained fastened; that at each end of the board a plug had been driven in a joint between bricks in the wall, about 2 inches wide and 1/2 inch thick; that one plug was badly bruised by careless hammering, so that it did not hold the nails well, and the other was split; that the nails driven into these plugs were in groups,—one group of three, one of two each, and two single nails; that the contact with the plugs was not secure, some of them being near the edges; that in his opinion the work was unskilful and showed a lack of proper care; that it was impossible to say what would have been shown by a proper inspection before the tank fell, but usually some evidence showing that it was parting from the wall would be noticeable by careful inspection; that if the upper part of the board had separated 1 or 2 inches from the wall it would have indicated a suspicious condition; that if workmanship were

originally sound you might assume that it would continue in a safe position.

On cross-examination, he said that a very usual way of fastening a tank was to drive plugs in the wall and nail the boards or cistern or brackets thereto; that it is customary to drive at least two or three good nails into such a plug; that the heads of the nails in this instance were not visible; that they had been "puttied" over so that without a careful search it would not have been possible to detect where the nails were before the tank fell; that he does not believe that after the work had been completed the fact that the nails were not properly secured in the plugs could have been noted in an ordinary inspection; that the work of securing the boards is practically concealed; that there were no brackets under the tank, but these are frequently omitted when the tank is fastened to a board as this one was.

Frank G. Howell, a witness next called on behalf of the plaintiff, gave evidence tending to prove that he is a son of the plaintiffs and that he assisted them in moving in July 9, 1900, and that there was no work then going on in the house; that three or four days after they moved in Mr. Ferdinand Schneider came to the house and said he wanted to look at the repairs; that the witness showed him through, and that he went all through the house except the basement,—into all the rooms; that he went to the bath-room door and looked in for a minute or so; that he seemed to make some objection to a temporary clothes closet Mr. Howell had constructed, but doesn't remember what he said; that he used the bath room, and never detected anything wrong before the accident.

The testimony of physicians, and others, tended to show serious injuries sustained by Mrs. Howell. Upon this evidence the court, on motion of the defendants, instructed the jury to return a verdict in their favor, and from the judgment thereon the plaintiffs have appealed.

*Mr. Charles A. Douglass, Mr. Frank D. Blackistone,* and *Mr. E. D. Sherrill* for the appellants.

*Mr. Samuel Maddox* and *Mr. H. Prescott Gatley* for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. There is no covenant in the contract of lease which the lessees accepted in this case, and the law is well settled that there is no implied warranty in the letting of a house that it is safe and fit for occupation. *Doyle* v. *Union P. R. Co.* 147 U. S. 413, 423, 37 L. ed. 223, 228, 13 Sup. Ct. Rep. 333. In the absence of an express warranty the rule of *caveat emptor* applies, and it is for the lessee to make the examination necessary to determine whether the premises are in safe condition and adapted to the purposes of his occupation. *Doyle* v. *Union P. R. Co.* 147 U. S. 413, 423, 37 L. ed. 223, 228, 13 Sup. Ct. Rep. 333; *Cowen* v. *Sunderland,* 145 Mass. 364, 1· Am. St. Rep. 469, 14 N. E. 117; *Booth* v. *Merriam,* 155 Mass. 521, 30 N. E. 85; *Franklin* v. *Tracy,* 25 Ky. L. Rep. 1409, 63 L. R. A. 649, 77 S. W. 1113; 18 Am. & Eng. Enc. Law, 2d ed. pp. 215, 216, and cases cited.

2. Passing by the question whether the parol evidence of the plaintiffs tending to show a promise to make repairs is admissible, in view of the fact that they subsequently accepted the written lease without objection, we are of the opinion that it does not furnish ground for the action. After an inspection of the premises the plaintiffs indicated certain repairs and improvements that were needed or desired, and these were made to their satisfaction. These had no relation to the water box or other closets fixtures. To give this promise and performance the effect of a special warranty covering, not only the improvements pointed out, demanded, and made, but also the complete safety of the premises in other respects, and their fitness for the general uses of occupancy, would be unreasonable, and the settled principles of the law of landlord and tenant will not warrant it. As the injury did not result from any of the improvements made, it is unnecessary to consider what would be the

liability of the defendants for the unskilfulness of their contractors had they undertaken to reconstruct or repair the closet fixtures, either at the request of the plaintiffs or of their own motion.

3. There is an apparent exception to the general rule before stated that seems well established also. Independent of the ordinary legal relations of landlord and tenant, the former owes a duty to the latter that is imposed by a general principle of the common law. He must neither misrepresent the condition of the premises, nor conceal from the tenant knowledge of defects attended with danger to the occupants. Where he has knowledge of such defects which are not open to the observation of his lessee, it is his duty to reveal them in order that the latter may be able to guard against injury from them.

While the failure to reveal such conditions may not constitute actual fraud or misrepresentation, it may, in a particular case, amount to such culpable negligence of duty as to afford ground for an action against the lessor in case the lessee sustains injury therefrom. The principle referred to, which has been applied to the ordinary letting of premises, as in this case, is "that one who delivers an article which he knows to be dangerous to another ignorant of its qualities, without notice of its nature or qualities, is liable for any injury reasonably likely to result, and which does result." *Cowen* v. *Sunderland,* 145 Mass. 364, 1 Am. St. Rep. 469, 14 N. E. 117; *Cutter* v. *Hamlen,* 147 Mass. 471, 474, 1 L. R. A. 429, 18 N. E. 397; *Cesar* v. *Karutz,* 60 N. Y. 229, 19 Am. Rep. 164; *Maywood* v. *Logan,* 78 Mich. 135, 18 Am. St. Rep. 431, 43 N. W. 1052; *Kern* v. *Myll,* 80 Mich. 525, 8 L. R. A. 682, 45 N. W. 587; *Lynch* v. *Ortlieb,* 70 Tex. 727, 8 S. W. 515.

Clearly plaintiff's case does not fall within this exception, because there is nothing in the evidence tending to show that the defendants had actual knowledge of the unskilful construction, or dangerous condition, of the water box, or made any misrepresentation in respect of it.

4. The appellant's contention goes further than this, and asserts the liability of the lessor in those cases, also, where he

might have obtained knowledge of the dangerous defect by the exercise of ordinary diligence in the inspection of his premises.

We cannot accept this as a sound principle of law applicable to the relations of the parties in this case.

It is, in our opinion, opposed to the views expressed by the Supreme Court of the United States in the case before cited. *Doyle* v. *Union P. R. Co.* 147 U. S. 413, 424, 37 L. ed. 223, 228, 13 Sup. Ct. Rep. 333.

The governing principle of that decision and of those cited with approval in the opinion of the court is, that no action lies by a tenant against a landlord on account of the condition of the premises in the absence of an express warranty or of active deceit. The mere fact that a careful inspection of the premises would have disclosed the defect is not sufficient. The tenant is charged with that duty on his own behalf. See *Bowe* v. *Hunking,* 135 Mass. 380, 46 Am. Rep. 471; *Keates* v. *Cadogan,* 10 C. B. 591, and cases before cited.

The appellants rely upon some decisions of the supreme judicial court of Massachusetts, later than those reviewed and approved in *Doyle* v. *Union P. R. Co.* 147 U. S. 413, 424, 37 L. ed. 223, 228, 13 Sup. Ct. Rep. 333, as carrying the doctrine of liability to the extent contended for by them. *Cutter* v. *Hamlen,* 147 Mass. 471, 474, 1 L. R. A. 429, 18 N. E. 397; *Lindsey* v. *Leighton,* 150 Mass. 285, 15 Am. St. Rep. 199, 22 N. E. 901. We need only examine the first of those cases. It was an action for deceit in letting a house that had been infected with diphtheria. Eight months before the plaintiff took the house a child of a former tenant had died in it of that disease. It was shown that the landlord knew this, but it was shown by him that the board of health had thereafter fumigated the premises and indorsed the certificate of inspection as correct. The court said: "If the case stopped here we should be of opinion that the landlord was justified in assuming that the house had been disinfected." But the case was held one for the jury on the ground that the condition of the drainage system of the house, within the knowledge of the landlord, was such as to put him upon notice that the danger of infection remained.

The expressions in that case, and in the other, upon which the appellants rely, to the effect that a landlord may be liable in an action for injuries resulting from dangers of the existence of which he ought reasonably to have known, are founded on evidence quite different from that under consideration in this case.

Interpreted by the evidence, they are nothing more than applications of the familiar principle that knowledge may not only be direct and complete, but may consist, also, of the knowledge of facts that, under the surrounding circumstances, would reasonably and justly put one upon inquiry.

The evidence in this case furnishes no ground for the application of that principle. The water box or flush tank had been substituted for one of older and different construction some two years before, at the request of a former tenant, and had been used with safety by him and the members of his household. The unskilful manner of its attachment to the plugs in the wall was concealed from view, and nothing had called the landlord's attention to it. It is true that it had become slightly detached from the wall, but this condition was not known to the landlord. It was the duty of the tenants, as we have before seen, to make an examination of the premises to determine whether they were in a safe condition and fit for their occupation. The defective construction of the water box was equally open to their observation as to that of the landlord. There was nothing more to charge him with actual knowledge than to charge them. They not only failed to discover the defect upon their inspection, but the members of a large family used the closet constantly for more than a week without its discovery.

We are of opinion that the court did not err in directing a verdict for the defendants, and the judgment thereon must be affirmed, with costs. It is so ordered. *Affirmed.*