236 F.2d 673
 Mabel D. KENDALL, Ancillary Administratrix of the Estate of Codie A. Whitman, deceased, Appellant,
v.
GORE PROPERTIES, Inc., a Corporation, American Security and Trust Company, a Corporation, and William Freeney Hickey, Appellees.
 No. 12818.
 United States Court of Appeals District of Columbia Circuit.
 Argued January 6, 1956.
 Decided June 14, 1956.
 Petition for Rehearing Denied July 17, 1956.
 
 COPYRIGHT MATERIAL OMITTED Mr. Arthur J. Hilland, Washington, D. C., with whom Mr. Thomas N. Kindness, Washington, D. C., was on the brief, for appellant.
 Mr. John L. Laskey, Washington, D. C., with whom Mr. Charles W. Arth, Washington, D. C., was on the brief, for appellees.
 Messrs. Leo A. Rover, U. S. Atty., at the time of argument, Lewis Carroll and Nathan J. Paulson, Asst. U. S. Attys., filed a brief on behalf of the United States of America, as amici curiae, urging affirmance.
 Before FAHY, DANAHER and BASTIAN, Circuit Judges.
 DANAHER, Circuit Judge.
 
 
 1
 Appellant is administratrix of the Estate of Miss Codie A. Whitman, deceased, on account of whose wrongful death this action had been brought. Decedent, on July 12, 1952, then 39 years of age, was strangled to death with a painter's towel in apartment 201 of which she was a tenant in the Ritz Apartments at 1631 Euclid Street, N. W., District of Columbia. Appellee Gore Properties, Inc., was the owner of the Ritz, appellee William F. Hickey was resident manager, and appellee American Security and Trust Company was rental agent. Perpetrator of the murder was one Harry Clifford Porter who had been engaged by Hickey to paint the interior of Miss Whitman's apartment. At the close of appellant's case, the trial judge directed a verdict in favor of all appellees. We find no basis whatever upon which American Security and Trust Company can be said to be liable, for its activities were limited solely to the issuance of leases, collection of rents and payment of maintenance charges when properly vouchered by Hickey. Accordingly, the appellees hereinafter mentioned are the corporate owner and resident manager Hickey. The principal question presented may be stated as follows:
 
 
 2
 "Did the Court err in directing a verdict for the appellees (defendants) at the close of appellant's evidence where the evidence showed (1) that the appellant's decedent, Codie A. Whitman, occupied as a tenant an apartment in an apartment house owned by one of the appellees and managed by the other two appellees, (2) that on Saturday afternoon, July 12, 1952, in her apartment, Miss Whitman was strangled and choked to death by an agent of the appellees, Harry Clifford Porter, (3) that on Friday night, July 11, 1952, immediately upon being employed by the appellees, Porter had been assigned by them to Miss Whitman's apartment to paint the interior of it, (4) that when the appellees employed Porter, they did not know him, made no investigation of him, obtained no references from him, and without any previous experience with him, assigned him to paint the interior of the apartment occupied by Miss Whitman, who was known by the appellees to be a single girl living alone and unprotected in her apartment, (5) that the appellees did not in any manner supervise or control Porter while he was painting Miss Whitman's apartment and gave him a key and unrestricted access to her and her apartment, and (6) that Porter was a person of unsound mind, dangerous and irresponsible and was adjudicated so and committed to the ward for insane criminals in St. Elizabeth's Hospital?"
 
 
 3
 Appellant took the pretrial deposition of Hickey, read it at the trial, and also called Hickey as an adverse witness. It was thus developed that on one or two occasions, perhaps two weeks before the murder, Hickey saw Porter outside an Air Force building near the National Airport wearing fatigue clothes such as are worn by enlisted men in the Air Force. Porter was cleaning brushes at the time. Although Hickey did not know Porter and knew nothing about him, he asked Porter if he would like to make some extra money. When Porter replied affirmatively Hickey invited him to call at the apartment house to give him a price for painting the interiors of various apartments. On Wednesday evening, July 9, or the following evening, Porter and Hickey agreed upon a price, and Hickey put Porter to work on the evening of Friday, July 11, painting Miss Whitman's apartment. Appellees knew Miss Whitman was single, living alone and unprotected in her apartment. At the time Hickey made arrangements with Porter he also employed through Porter two other men to do painting. Hickey knew none of them, had no knowledge of where they had worked, what kind of work they had done, by whom they had been employed, had no references concerning them, and made no investigation of any of them. On the day Miss Whitman met her death there had been employed at the apartment, a hall man, one Keyes, who some six months to twelve months earlier had been engaged by Hickey. Hickey had made an investigation of Keyes before hiring him, discovered he had been convicted of robbery and had recently been released from the penitentiary and was on parole. When Hickey first talked to Porter about taking the painting job the evidence runs:
 
 
 4
 "Q. At the time you asked him that, what did you know about him? A. Just that he worked, he was in the service and he was working over there at the Air Force.
 
 
 5
 "Q. Did you know where he was from? A. No, sir.
 
 
 6
 "Q. Did you know who his parents were? A. No, sir.
 
 
 7
 "Q. Did you know where he was employed before he came in the service? A. No, sir, I did not.
 
 
 8
 "Q. Did you know how long he had been in the service? A. No.
 
 
 9
 "Q. Did you know anyone for whom he had worked? A. No.
 
 
 10
 "Q. Did you know anything about his work? A. No.
 
 
 11
 "Q. Did you know anything about his habits? A. No, sir.
 
 
 12
 "Q. Did you know anything about his past record in any connection? A. No, sir, not at that time."
 
 
 13
 Under these circumstances, between 6 and 7 P.M. on the evening of Friday, July 11, Hickey, Porter and Miss Whitman went to her apartment. Hickey started Porter painting in the kitchen, could not say how long he remained there but Hickey left. He had no recollection of returning to Miss Whitman's apartment that evening, did not know when Porter stopped working that night, did not see Miss Whitman again that evening, and had no recollection of seeing Porter leave. The following morning Hickey took Porter again to Miss Whitman's apartment around 8 A.M. He looked at the painting which had been done in the kitchen, did not see Miss Whitman in the apartment and Hickey left. Although he saw Miss Whitman downstairs in the lobby around 3:30 P.M. on the afternoon of July 12, 1952, Hickey did not remember about going to the apartment during the day, did not see Porter leave the building at any time that day, had no knowledge when Porter quit working on Saturday, did not know whether anyone else was working in the apartment with Porter, but certainly paid no one else for doing so, and did not at any time on Saturday send anyone to the apartment to see Porter. Hickey next saw Porter in the basement of the apartment Sunday around mid-day, when he again admitted Porter to Miss Whitman's apartment. Although Hickey visited the apartment two or three or four times Sunday afternoon, and at no time saw Miss Whitman there, he made no inquiry as to her whereabouts. Although he testified in his deposition he had given Porter no keys to Miss Whitman's apartment, he was examined by appellant's counsel concerning his testimony at the coroner's inquest on July 15, 1952, as follows:
 
 
 14
 "Q. And then were you asked this question, following those that I have just asked you:
 
 
 15
 "`Q. At any time had you given Mr. Porter the key to this apartment?'
 
 
 16
 "And didn't you answer: `I maybe gave it to him Saturday morning. I am not sure, sir, that I did. I can't think of any reason why I should.'
 
 
 17
 "Were you asked that question and did you make that answer? A. Well, whatever is there, sir, is the answers I made to it."[1]
 
 
 18
 When ruling on appellees' motion for directed verdict the trial judge said:
 
 
 19
 "Unless the employer is put upon notice by some fact which would cause him to make an inquiry as to the mentality, mental health or habits of the proposed employee, then, in the Court's opinion, no burden rests upon a proposed employer to make an examination as to such phases of the proposed employee's life, habits and activities."
 
 
 20
 After further recapitulation of various aspects of the problem, the trial judge said:
 
 
 21
 "Now, the question arises under that state of facts, standing alone, is it incumbent upon the defendant in order to discharge his obligation, to free himself from negligence, to make an independent inquiry as to the sanity of the individual who later is shown to have been a person of unsound mind? * * *" (Emphasis added.)
 
 
 22
 It is true that appellant's complaint had alleged that Porter "was then and there a person of unsound mind and dangerous and irresponsible," but the question was not as narrowly to be stated as the trial judge put it. It was not merely that the defendants might be called upon "to make an independent inquiry as to the sanity of the individual who later is shown to have been a person of unsound mind. * * *," supra. The allegation upon which the plaintiff's case must rest, taken as a whole, charges that the appellees negligently employed Porter, that they negligently provided him with a key to Miss Whitman's apartment, and that they "negligently allowed him to go in and out of and remain in the said apartment without proper supervision or proper control." As is to be deduced from the evidence previously summarized, it was not simply a matter of whether or not Porter was insane. It was a matter of whether or not, in the absence of any investigation whatever, any man, Porter or anyone else, sane or insane, should have been employed as here, or without any supervision whatever, or the attempted exercise of any control over his conduct, should have been permitted by the landlord to have access to the apartment of this woman tenant, living alone and unprotected. This was the gravamen of the case.
 
 
 23
 A reading of the entire record discloses a repeated series of colloquies between counsel and trial judge concerning Porter's insanity and the appellees' knowledge thereof. Seemingly overlooked was the alleged negligence of the appellees. If a reasonable investigation had been made as to Porter's background which disclosed no basis for a conclusion of lack of competency, if he had been sufficiently long employed to have established himself as entitled to trust, if the landlord or the tenants had had adequate opportunity to scrutinize him and his conduct and had found a basis upon which confidence could be reposed in him, and if, thereafter, he had suddenly gone berserk, a jury, we may suppose, would scarcely have deemed the landlord liable. But that is not this case. Here the appellees exercised no care whatever, either in the selection of Porter or the workers hired with him or at his instance. The latter were assigned to paint the apartments of people who were away. But Porter was assigned to after-hours employment, without supervision, in the apartment of a tenant living alone. No one asked where he had last been employed as a basis for a check on his work performance. No one so much as telephoned to his commanding officer to ascertain what information he would be able to supply. No one called his wife. Although he was not even a resident of Washington, no one asked that he produce references or recommendations. In such failure to act, in almost purposeful refusal to find out anything about the man, and thereafter in the failure to supervise this stranger, lay the basis for the claimed breach of duty by the appellees. Appellees knew full well, or are charged with knowing, that no reasonable steps had been taken with reference to the employment of Porter, and thus that a risk was created, the extent of which depended upon the circumstances of the employment which followed. Slight care might be expected as to the employment of a yard man, not ordinarily to be sent into a tenant's apartment. But a very different series of steps are justified if an employee is to be sent, after hours, to work for protracted periods in the apartment of a young woman tenant, living alone.
 
 
 24
 Much of what has been said applies equally to another aspect of the case. Here Miss Whitman had two locks on her door, an upper and a lower lock, working independently of each other. The locks were obviously for the protection of the tenant, living alone, that she might be as secure against intruders as reasonable precautions made possible. She had a lease pursuant to which she paid for shelter and protection. She had one set of keys for herself; another set was retained by the landlord. She was entitled to assume that appellees would introduce no intruder into her apartment. She had a right to expect that the landlord would not give up his set of keys to a stranger or so negligently fail to guard them that they might fall into the hands of one bent on mischief. Miss Whitman had no voice in the selection of the landlord's employee. She was entitled to assume that appellees would assign no person without supervision to work after hours in her apartment, when they had failed to exercise any care in ascertaining the trustworthiness of such person. Here, however, appellant claims, in breach of their clear duty to their tenant, appellees sent Porter to work after hours. The only instructions given to Porter and Prince were that Hickey "would have no drinking at any time or any visiting in apartments, I told them that. Of course, with Prince I knew there wouldn't be because he was a colored man."
 
 
 25
 To say that appellees may fail to make even the most cursory inquiry concerning Porter and then be allowed to excuse themselves in their ignorance is to say that their recklessness will be exalted. A premium thus would be placed even upon a wilful refusal to make an elementary inquiry into the habits and tendencies and work experience of employees of landlords who choose to disregard the possibilities of harm to a trusting woman, living alone where she had a right to expect inviolability of her person, even more than her property, at the hands of an unknown stranger brought there by her landlord. In this compact land area of only 60 square miles known as the District of Columbia, more than 828,000 people dwell.[2] Thousands of them are government women employees, like Miss Whitman, living, often alone, in small apartments where they have a right to think they are not to be molested as a result of the reckless ignorance of their landlords in the selection of apartment employees.
 
 
 26
 We have never said that a landlord may, with impunity, disregard elemental precautions and make no inquiry whatever concerning an employee who is to work in his apartments or, without supervision to be sent to accomplish the landlord's objectives, into the leased premises of an unprotected tenant, living alone. Here, the jury could have found there was no care whatever in either respect. Accordingly, on this aspect of the case, the appellant made out, at the very least, a prima facie case of negligence. Thus, it was error for the trial judge to direct a verdict for the appellees.[3]
 
 
 27
 Whatever the law may be elsewhere, in the District of Columbia, to govern the usual complex of human relationships, we apply the standard of ordinary care. Thus, particular conduct, depending upon circumstances, can raise an issue for the jury to decide in terms of negligence[4] and proximate cause.
 
 
 28
 Appellee cites such cases as Bradley v. Stevens[5] and Longo v. Tabasso[6] and similar cases involving business invitees, but our Municipal Court of Appeals, correctly recognizing the policy of this Circuit observed in Fleming v. Bronfin[7]:
 
 
 29
 "* * * [W]e think there was a clear duty on defendants to use reasonable care in the selection of a delivery man. The duties of such employee carried him into homes where likely there would be women and children alone and unprotected and it was defendants' duty to use reasonable care to select one reasonably fit to perform such duties."
 
 
 30
 The court recited a series of facts from which it was unanimously concluded that a reasonable inquiry had been made as to the suitability of the employee before he was hired. In Argonne Apartment House Co. v. Garrison[8] the treasurer of the apartment house company interviewed one Johnson as well as other prospective employees and required them to exhibit written references. Johnson furnished at least two or three such references which were written on business letterheads and which appeared to the company treasurer to be satisfactory. Johnson was put to work under the observation of the resident manager who, after some four or five days, assigned Johnson to be helper to the electrician, one Jackson. We there pointed out: "It cannot be inferred or assumed that these recommendations were not bona fide or that they were bogus." Recognizing fully the duty of the owner of the apartment house to exercise reasonable care in the employment of his employee, the court nonetheless concluded that "there was no proof of negligence on the part of the defendant in employing Johnson * * *." In that case the tenant had asked the apartment manager to install an electric socket in her bedroom. Jackson, an old and trusted employee of the defendant whom the plaintiff had often seen around the apartment and knew to be trustworthy, brought with him the new employee Johnson, and after getting him started on the work, left the apartment. A guest of the tenant had left jewelry on top of a bureau near where the employee was working. Johnson stole the jewelry. Yet other valuable jewelry in unlocked drawers was untouched. Our records show that the appellant there urged us to rule that the plaintiff had been guilty of contributory negligence. It was argued that, had she not exposed her jewelry to an obvious peril when she left it in full view of a strange colored man, it would not have been touched. Appellee here urges upon us as controlling, a dictum to be found in the Argonne case which reads: "There was no evidence to show that a further investigation would have disclosed sufficient facts to put the defendant on notice as to the dishonesty of Johnson." The fact had been developed that Johnson, some four years earlier, had been convicted of intoxication. The dictum must be understood to mean that a conviction of intoxication does not suggest that a person so convicted was dishonest. We continued: "* * * even though the employer had knowledge that an employee had been convicted of such a charge, that would not in itself put the employer on notice as to the dishonesty of such employee." In any event, in the instant case the evidence is uncontradicted that the appellees made no investigation whatever. As we have already remarked, particular conduct, depending upon circumstances, gives rise to the duty, just as in Medes v. Hornbach[9] where we said:
 
 
 31
 "It is the duty in general of one operating a garage in which automobiles are kept in storage for pay to exercise ordinary care by the employment of trustworthy servants and otherwise for the safe-keeping of the cars in his charge."
 
 
 32
 We have heretofore made clear as to apartment houses, the reasons which underlie the landlord's duty under modern conditions and which, as to various hazards, call for at least "reasonable or ordinary care, which means reasonably safe conduct, but there is no sufficient reason for requiring less."[10] True, the landlord does not become a guarantor of the safety of his tenant.[11] But, if he knows, or in the exercise of ordinary care ought to know, of a possibly dangerous situation and fails to take such steps as an ordinarily prudent person, in view of existing circumstances, would have exercised to avoid injury to his tenant, he may be liable. So if he negligently takes such steps as he did take, he may be liable.[12] "The landlord was * * * under a duty not to create an unsafe condition in the premises either permanent or temporary by any affirmative action on his part."[13] (Emphasis supplied.) Thus, the landlord would be liable if Miss Whitman without fault on her part, had met her death due to the fault of Porter: by electrocution[14] as, if without notice to Miss Whitman, he had left the light switch open and exposed; by suffering a fractured skull, due to plaster falling from the ceiling defectively loosened through means adopted by Porter[15]; by suffering a fractured skull because without knowledge to Miss Whitman a window had been left in such condition, with window chains out of the pulleys, that it fell on her as she tried to close the window[16]; or by breaking her neck because Porter's ladders had negligently been so placed as to occasion her fall.
 
 
 33
 In short, in the usual landlord-tenant relationships, under the circumstances supposed, the landlord's liability may be established.
 
 
 34
 "Independent of the ordinary legal relations of landlord and tenant, the former owes a duty to the latter that is imposed by a general principle of the common law. He must neither misrepresent the condition of the premises, nor conceal from the tenant knowledge of defects attended with danger to the occupants. Where he has knowledge of such defects which are not open to the observation of his lessee, it is his duty to reveal them in order that the latter may be able to guard against injury from them."[17]
 
 
 35
 Here, Miss Whitman had no knowledge of the negligent circumstances attendant upon the selection of Porter. Certainly such circumstances were not open to her observation, and she clearly had a right to assume that the landlord neither would create a risk nor expose her to possible danger through his introduction into her apartment of the man Porter.[18]
 
 
 36
 In the trial court, in pressing appellees' motion for a directed verdict, their counsel had relied upon Howard v. Swagart.[19] His contention, simply stated, was that Porter's act was an intervening new cause which became, therefore, the proximate cause of the harm complained of. Accordingly, he would have the court say, appellees' negligence did not result in natural and unbroken sequence, in the death of Miss Whitman. We cannot tell what weight the trial judge gave to this claim, and since the point may arise in a new trial, we will briefly discuss the matter. In the Howard case, the plaintiff had been struck by a car driven by one Cherry, who was neither its owner nor its authorized user. Its owner had parked the car in a garage where one Clinton was employed. Clinton, without the permission or knowledge of his employer, one night had taken the bailed car from the garage. He later told Cherry he had bought the car from gambling winnings. The next day Cherry asked Clinton's permission to drive what he thought was Clinton's car, and having so been permitted to drive, Cherry struck and injured the plaintiff. On that set of facts, we held that an entirely new intervening cause, Cherry's negligence, had come into existence, and that the owner, or bailee, could not be liable for the negligent action of every person, other than the thief, who drove the car subsequent to the theft. To the extent that the trial judge may have relied upon the Howard case, we interpolate this admonition as to its non-applicability.
 
 
 37
 Our rule is that "The proximate cause of an injury is ordinarily a question of fact for the jury."[20] Moreover, we have made it clear "that a wilful, malicious and criminal act of an intermeddler was not an `efficient intervening cause'"[21] or where an injured party sued the owner under not dissimilar circumstances set forth in various cases.[22] A defendant need not have foreseen the precise injury, nor "should [he] have had notice of the particular method"[23] in which a harm would occur, if the possibility of harm was clear to the ordinarily prudent eye.[24] Finally, on this point as we consider proximate cause, in terms of appellant's case at the time of the motion for directed verdict, the negligence of the appellees in relation to the ultimate harm might have been found to be as fully established as in comparable circumstances was the violation of the statute in Janof v. Newsom.[25] There we said flatly that the violation was the proximate cause of the injury, a result approved without question in Ross v. Hartman.[26]
 
 
 38
 In the Janof case, our statute[27] provided that every licensed employment agency was duty-bound "* * * to communicate orally or in writing with at least one of the persons mentioned as references for every applicant for work in private families * * *." The defendant agency owner registered a servant "with no investigation or verification of the address given her, and with no investigation or record of any references * * *."[28] The agency sent out a servant who stole $1,000. Reversing a defendant's judgment, we pointed out that "the very injury has occurred which the statute intended to prevent, and consequently the violation of the statute is the proximate cause of the injury."[29] So, on the record before us, without more, the jury[30] could have found that appellees had been negligent and that such negligence was the proximate cause of the harm. In light of the views expressed, it is clear the appellees' motion for a directed verdict was erroneously granted.
 
 
 39
 It was stipulated that Porter on November 14, 1952, was ordered committed "until he is mentally competent to stand trial or until pending charges against him are disposed of according to law." The trial judge excluded records of the Veterans Administration, testimony of Dr. Epstein who was the admitting physician at St. Elizabeth's Hospital, and certain other proffers. After a hearing the judge quashed a writ of habeas corpus which had commanded the production of Porter as a witness, for the judge concluded his appearance in court would have the effect of disturbing him, with resulting emotional discomfort which might interfere with his process of recovery. We comment only upon one or two problems which may arise upon a new trial.
 
 
 40
 Of course, the burden of proof on the case as a whole will remain with the appellant throughout. It may be supposed, however, that appellees will now wish to offer some evidence, explaining either what steps they took to select a trustworthy servant or, having selected Porter, what factors they relied upon to obviate the need for supervision over him. Appellees argued previously they were under no burden in such particulars until somehow they had been put on notice that Porter was insane. We pointed out that a jury might conclude otherwise because of the circumstances noted and discussed. Either side may wish to call various of the many people who were interviewed by Attorney Frey,[31] or Porter's wife,[32] or his mother-in-law, his landlord, or others who may be able to adduce evidence, importantly pertinent.
 
 
 41
 Dr. Epstein has already testified, and may do so again, that Porter conversed lucidly and possessed "knowledge and appreciation of the obligation of an oath." Pursuant to District of Columbia v. Armes,[33] it may well be that Porter at the time of a new trial will prove competent. In the interests of justice, unless a strong showing requires that the court's discretion be exercised to deny Porter's production, the parties and the court should not be deprived of the testimony of the one man, not a party, who may know what was said and can tell what happened between himself and Hickey over the critical days here involved. Of course his Fifth Amendment rights may be involved so far as the murder is concerned, and such rights must be protected. The trier will surely exercise a watchful supervision in this respect, at the instance of Mr. Frey, the committee.[34]
 
 
 42
 If after careful appraisal of all factors in the light of Dr. Epstein's testimony at a preliminary hearing, the trial judge shall decide that Porter simply should not be caused to appear in court, his testimony should be taken under supervision by the court, pursuant to Rule 26[35] and other applicable Rules, subject to the safeguards of Rule 30 (b).[36] It may appear that arrangements should be made for taking his testimony at the hospital, in the presence of a supervising physician, with such recesses as the latter recommends, to the end that the welfare of Porter as well as the interests of the parties may be regarded. The trial judge should control the procedure throughout, whether by deposition or interrogatories, to accomplish the desired results, but every reasonable effort should be made to make available all material and relevant evidence which can be supplied by Porter.
 
 
 43
 Both parties have recognized, and briefed us concerning rulings on, various evidence problems, but it seems unlikely that much question will arise, if as we assume and expect in the light of the record, Porter will qualify and be called upon to testify, as indicated. We have no showing on this record as to whether or not Dr. Epstein's duties as admitting physician at St. Elizabeth's Hospital place him in the category of an examining physician.[37] If so on November 26, 1952, Porter's disclosures then made[38] may come within the exception to the privilege discussed in the Taylor case. Again, statements by Porter will perhaps be offered, not as proof of the purported facts contained in the utterance, but to prove only that such statements were made "without reference to the truth of the matter asserted."[39] A proper basis having been established, Porter's service records may be offered in evidence,[40] as is true of the records of the Veterans Administration.[41] Diagnoses and opinions appearing in the records of St. Elizabeth's Hospital will be distinguishable from entries made in regular course.[42] Attorney Frey, as committee, may waive the privilege of the statute,[43] but without such waiver, our recent Taylor rule remains unaffected by amendatory legislation.[44] Moreover, we find no error in the admission of Porter's confession.
 
 
 44
 Finally, we envision careful attention by counsel and the court to the spirit and the purpose of the pretrial procedures outlined in Rule 16.[45] An exceptional case of this character is a challenge to all concerned.
 
 
 45
 Reversed.
 
 
 
 Notes:
 
 
 [1]
 Granting to appellant the most favorable intendment to which she might be entitled under the evidence when the court considered the motion for directed verdict, even though it be somewhat strained, we cannot say that a jury could not have found that Porter had been entrusted with a key
 
 
 [2]
 The Washington Criminal Justice Association, a member of the Community Chest since 1939 in its Eighteenth Annual Report, April 1954, discloses that in this densely populated community for the year 1952, 14,550 felonies or serious crimes were committed. The analysis, p. 3, shows, in part:
 Aggravated Assault 4,608 cases
 Grand Larceny 2,014 "
 Housebreaking 5,211 "
 Murder & Manslaughter 73 "
 Rape & Carnal Knowledge 197 "
 Robbery 1,395 "
 
 
 [3]
 On a motion for a directed verdict, "* * * it is well settled that the evidence must be construed most favorably to the plaintiff; to this end he is entitled to the full effect of every legitimate inference therefrom. If upon the evidence, so considered, reasonable men might differ, the case should go to the jury; if, on the other hand, no reasonable man could reach a verdict in favor of the plaintiff, the motion should be granted." Jackson v. Capital Transit Co., D.C.Cir., 1938, 69 App.D.C. 147, 148, 99 F.2d 380, 381, certiorari denied, 1939, 306 U.S. 630, 59 S.Ct. 464, 83 L. Ed. 1032; Tobin v. Pennsylvania R. Co., D.C.Cir., 1938, 69 App.D.C. 262, 100 F. 2d 435, certiorari denied, 1939, 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040
 
 
 [4]
 "The question is one of negligence, — whether particular circumstances gave rise to a duty which had not been performed." Best v. Dist. of Columbia, 1934, 291 U.S. 411, 419, 54 S.Ct. 487, 490, 78 L.Ed. 882; Boland v. Love, D.C. Cir., 1955, 95 U.S.App.D.C. 337, 222 F. 2d 27; "Where uncertainty as to the existence of negligence arises * * * because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury." Gunning v. Cooley, 1930, 281 U.S. 90, 94, 50 S.Ct. 231, 232, 74 L.Ed. 720
 
 
 [5]
 1951, 329 Mich. 556, 46 N.W.2d 382, 34 A.L.R.2d 367
 
 
 [6]
 1951, 62 Ohio Law Abst. 199, 106 N.E. 2d 587
 
 
 [7]
 D.C.Mun.App., 1951, 80 A.2d 915, 917; D.C.Mun.App., 1954, 104 A.2d 407
 
 
 [8]
 D.C.Cir., 1930, 59 App.D.C. 370, 42 F.2d 605, 608
 
 
 [9]
 1925, 56 App.D.C. 13, 14, 6 F.2d 711, 712
 
 
 [10]
 Kay v. Cain, 1946, 81 U.S.App.D.C. 24, 25, 154 F.2d 305, 306
 
 
 [11]
 Pessagno v. Euclid Inv. Co., 1940, 72 App.D.C. 141, 143, 112 F.2d 577, 579; Gladden v. Walker & Dunlop, 1948, 83 U.S.App.D.C. 224, 225, 168 F.2d 321, 322, and cases cited
 
 
 [12]
 Ibid
 
 
 [13]
 Bailey v. Zlotnick, 1945, 80 U.S.App. D.C. 117, 118, 149 F.2d 505, 506, 162 A.L.R. 1108
 
 
 [14]
 Gladden v. Walker & Dunlop, supra note 11; Kay v. Cain, supra note 10
 
 
 [15]
 Bailey v. Zlotnick, supra note 13
 
 
 [16]
 Carusi v. Schulmerick, 1938, 69 App. D.C. 76, 98 F.2d 605, certiorari denied, 1938, 305 U.S. 645, 59 S.Ct. 148, 83 L.Ed. 417
 
 
 [17]
 Howell v. Schneider, D.C.Cir., 1905, 24 App.D.C. 532, 548
 
 
 [18]
 As we have demonstrated, liability has been founded upon the principles discussed
 The breach of duty must be dissociated from the murder although the latter followed the breach. Appellant has at no time invoked the doctrine of respondeat superior. It has not here been urged that an act of the nature involved was in furtherance of the landlord's business or was committed by one acting within the scope of his employment. Cf. Park Transfer Co. v. Lumbermens Mut. Casualty Co., 1944, 79 U.S.App.D.C. 48, 142 F.2d 100; Grimes v. B. F. Saul Co., 1931, 60 App.D.C. 47, 47 F.2d 409.
 
 
 [19]
 1947, 82 U.S.App.D.C. 147, 161 F.2d 651
 
 
 [20]
 Munsey v. Webb, 1911, 37 App.D.C. 185, 188, affirmed, 1913, 231 U.S. 150, 34 S.Ct. 44, 58 L.Ed. 162; Boland v. Love, supra note 4; Hanna v. Fletcher, 1956, 97 U.S.App.D.C. 310, 231 F.2d 469
 
 
 [21]
 Howard v. Swagart, supra note 19, 82 U.S.App.D.C. at page 151, 161 F.2d at page 655
 
 
 [22]
 Ross v. Hartman, 1943, 78 U.S.App. D.C. 217, 139 F.2d 14, 158 A.L.R.2d 1370, certiorari denied, 1944, 321 U.S. 790, 64 S.Ct. 790, 88 L.Ed. 1080; Schaff v. R. W. Claxton, Inc., 1944, 79 U.S.App.D.C. 207, 144 F.2d 532; Boland v. Love, supra note 4
 
 
 [23]
 Munsey v. Webb, supra note 20, 231 U.S. at page 156, 34 S.Ct. 44, 58 L.Ed. 162
 
 
 [24]
 Cf. Restatement, Torts § 449; Ross v. Hartman, supra note 22; Fletcher v. Baltimore & Potomac Railroad, 1897, 168 U.S. 135, 144, 18 S.Ct. 35, 42 L.Ed. 411
 
 
 [25]
 1931, 60 App.D.C. 291, 53 F.2d 149
 
 
 [26]
 Supra note 22
 
 
 [27]
 Now D.C.Code § 47-2103 (1951)
 
 
 [28]
 Janof v. Newsom, supra note 25, 60 App.D.C. at page 293, 53 F.2d at page 151
 
 
 [29]
 Id., 60 App.D.C. at page 294, 53 F.2d at page 152
 
 
 [30]
 "For `The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable.' Fact finding does not require mathematical certainty." Schulz v. Pennsylvania R. Co., 1956, 350 U.S. 523, 526, 76 S.Ct. 608, 610; and see Carusi v. Schulmerick, supra note 16, 69 App.D.C. at page 79, 98 F.2d 605, and cases cited in note 20, supra; cf. Galloway v. United States, 1943, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458
 
 
 [31]
 Mr. Frey as counsel for Porter in the criminal case also petitioned for determination of Porter's sanity. After Porter has been committed to St. Elizabeth's, the District Court appointed Frey to serve as his committee
 
 
 [32]
 D.C.Code § 14-306 (1951)
 
 
 [33]
 1883, 107 U.S. 519-520 et seq., 2 S.Ct. 840, 27 L.Ed. 618
 
 
 [34]
 United States v. Reynolds, 1953, 345 U.S. 1, 8, 73 S.Ct. 528, 97 L.Ed. 727
 
 
 [35]
 Fed.R.Civ.P., 28 U.S.C
 
 
 [36]
 Ibid
 
 
 [37]
 Taylor v. United States, 1955, 95 U.S. App.D.C. 373, 222 F.2d 398. The day of Porter's admission to St. Elizabeth's, November 26, 1952, Dr. Epstein was "admitting physician" (J.A. 26)
 
 
 [38]
 Ibid. "Where there is a strong showing of necessity, [as here] the claim of privilege should not be lightly accepted * * *." United States v. Reynolds, supra note 34, 345 U.S. at page 11, 73 S.Ct. at page 533, 97 L.Ed. 727
 
 
 [39]
 2 Wigmore, Evidence §§ 228-233 (3d ed. 1940); 6 Wigmore, Evidence § 1766
 
 
 [40]
 28 U.S.C. § 1732 (1952); Norwood v. Great American Indemnity Co., 3 Cir., 1944, 146 F.2d 797, 800
 
 
 [41]
 38 U.S.C.A. § 456 (1952); and see supra note 40
 
 
 [42]
 New York Life Ins. Co. v. Taylor, 1944, 79 U.S.App.D.C. 66, 147 F.2d 297; Washington Coca-Cola Bottling Works v. Tawney, 1956, 98 U.S. App.D.C. 151, 233 F. 2d 353
 
 
 [43]
 Taylor v. United States, supra note 37; cf. Catoe v. United States, 1942, 76 U.S.App.D.C. 292, 295, 131 F.2d 16, 19
 
 
 [44]
 Pub.L.No. 313, § 4, Act of Aug. 9, 1955, 69 Stat. 609, D.C.Code § 14-308
 
 
 [45]
 Fed.R.Civ.p