Verline OLIVER, Administratrix of the Estate of Rembert Marshall Oliver, Appellant,

v.

SOUTHERN RAILWAY COMPANY and General Motors Corporation.

No. 71–2005.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1972.

Decided Dec. 29, 1972.

Mr. R. Harrison Pledger, Jr., Washington, D. C., with whom Mr. Max M. Goldberg, Washington, D. C., was on the brief, for appellant.

Mr. Richard W. Turner, Washington, D. C., with whom Mr. Stephen A. Trimble and Mr. Nicholas D. Ward, Washington, D. C., were on the brief, for appellee, Southern Railway Co.

Mr. James C. Gregg, Washington, D. C., for appellee, General Motors Corp.

Before Justice CLARK,* of the Supreme Court of the United States, and McGOWAN and MacKINNON, Circuit Judges.

---

* Sitting by designation pursuant to Title 28, U.S.C. Section 294(a).

PER CURIAM:

Appellant's decedent was killed when, on May 30, 1968, the unloaded 1967 General Motors Corporation flat bed truck he was driving west on Virginia Route 661 collided with the Southern Railway Company freight train engine proceeding north through the grade crossing located north of Manassas, Virginia. Appellant, decedent's wife and administratrix of his estate, brought a diversity suit in the District Court for wrongful death under applicable Virginia law, Va.Code Ann. § 8–633 *et seq.* (Michie Supp. 1972), alleging in her amended complaint that Southern, by its negligence, and General Motors, by its negligence and warranty breach, did "jointly, severally and concurrently" cause the death of her husband. The trial judge directed verdicts in favor of (1) Southern at the conclusion of appellant's opening statement and (2) General Motors after appellant's evidence had been presented. This appeal challenges the propriety of those rulings; and, for the reasons hereinafter appearing, we reverse as to both.

### I

In her amended complaint against Southern, appellant asserted that the railway company was negligent with respect to both the manner in which it operated the train, and the physical conditions it permitted to exist at the site of the railroad grade crossing.[1] In the opening statement in her behalf to the jury, it was contended that the crossing was obscured by trees and that the train failed to sound its whistle or bell as required by Virginia law. It was stated as well that the decedent attempted to apply his air brakes but that they failed due to defective formation of the brake valve assembly installed by General Motors.

Southern, in moving for a directed verdict on the basis of the foregoing statement, seized upon the facts asserted by appellant as showing the negligence or warranty breach of General Motors represented by that brake failure and urged that, as a matter of Virginia law, such a failure would constitute an independent intervening cause of the accident which would operate to insulate Southern from liability. Appellant's counsel opposed the motion on the ground that he intended to prove concurrent negligence of both defendants. Ruling that there could not be concurrent negligence[2] and that if the jury found from the evidence that there was such a brake failure Southern would not be liable, the trial judge granted the motion. While we do not fault this statement of the substantive law, we find that the standard governing the granting of a directed verdict at this stage of a case was misapplied.

Appellant does not, nor could she, challenge the inherent power of the court to direct a verdict at the conclusion of her opening statement. Best v. District of Columbia, 291 U.S. 411, 54 S.Ct. 487, 78 L.Ed. 882 (1934). *See generally* Annot., 5 A.L.R.3d 1405 (1966). *Best* does, however, require that "it must clearly appear, after resolving all doubts in plaintiff's favor, that no cause of action exists" before the court may direct a verdict on an

---

1. Specifically, appellant alleged *inter alia* in her pretrial statement that Southern operated the train at an excessive speed, and permitted the crossing to become obscured by foliage while failing to provide adequate warning devices for vehicular traffic.

2. Despite appellant's reliance at trial on proof of concurrent negligence, it is clear from her amended complaint quoted above that she was also alleging "several" liability. In view of the complaint and the facts set forth in her pretrial and opening statements, we do not think it justifiable to limit the grounds for appellant's opposition to that stated at trial. *See* Lampka v. Wilson Line of Washington, Inc., 117 U.S.App.D.C. 55, 325 F.2d 628, 629 (1963).

opening statement. 291 U.S. at 416–417, 54 S.Ct. at 489. Applying that test to the statement before us, the doubt we believe should have been resolved in appellant's favor is the question whether General Motors would have been proven to be an independent intervening cause —a question which the trial judge himself acknowledged would turn on the jury's view of the evidence. Indeed, he himself ultimately resolved the question in favor of plaintiff's claim against Southern by directing a verdict in favor of General Motors.

■ Whether properly accomplished by judge or jury, the exoneration of General Motors would remove the independent intervening cause assertedly insulating Southern, leaving the latter's liability a question to be resolved on the evidence presented. While we intimate no view on the efficacy of its defense, given the possibility that General Motors would prevail upon its presentation,[3] and that Southern might then be found liable if appellant proved the contentions set forth in her opening statement, we find that it was premature to absolve Southern. *See* Tuck v. Chesapeake & Ohio Ry. Co., 251 F.2d 180, 181 (4th Cir. 1958); Cioffi v. Queenstown Apartments, Inc., 100 U.S. App.D.C. 227, 243 F.2d 650 (1957).

II

As indicated above, appellant rests her claim against General Motors on the assertion that when the decedent applied his brakes to avoid the collision, the internal valve cage of the air brake application valve assembly failed due to improper design, manufacture and inspection of the assembly. This prevented the brakes from being engaged, thus causing the fatal accident which ensued.

The testimony elicited from appellant's witnesses reveals that the truck, composed of a cab and a flat body on which a hydraulic crane was installed to unload brick and cinder block, was struck by the train at the left front of the cab. Primary damage was restricted to the cab, which was demolished. The valve assembly in question, affixed to the floorboard on which the driver's legs rest, was found 50 to 75 feet from the point of impact and was removed on the day of the accident along with the remainder of the truck wreckage to the Alexandria, Virginia yard of decedent's employer, the J. J. Taylor Company. Approximately three weeks later the employer was prompted to inspect the valve assembly for the first time since the accident. Upon its removal it was observed that no damage had been done to the floorboard at the point of fixation, nor to the brake pedal or the connecting shaft.

The operation of the assembly was described as being initiated by the application of pressure on the brake pedal. Through a linkage apparatus this pressure is transmitted to a piston which, upon its movement upward, permits the release of pressurized air through the exhaust valve into the brake system. Once sufficient pressure is applied to activate the assembly, the brakes operate with a constant force independent of any increase in pressure on the brake pedal. And, once put into operation, the brakes stop the wheels so that if the brakes remain applied, the truck will skid.[4] There were no skid marks found at the scene of the accident.

3. At oral argument there were intimations that the train engineer was present at the trial to testify for one or both defendants. To illustrate the possibility suggested, we need only suppose his testimony would reveal inattention on the decedent's part such that he would not have attempted to apply his brakes.

4. The skidding phenomenon was also said to result if either of the two brake back-up systems were engaged—one automatic, applied as soon as system air pressure dropped below 60 psi; one manual, applied by pulling a lever to release air through another exhaust valve.

The inspection of the valve assembly disclosed that the front of the casting was broken and the bottom plate bent. The employer's vice-president for maintenance testified that such a break would prevent the upward movement of the piston, thereby preventing operation of the air brake. He further stated that, while not knowing what caused the break, it was possible that the collision did. Appellant's key witness, however —a metallurgist with an expertise in fracture analysis—stated that in his opinion the collision could not have caused the break. Rather, he stated it to have resulted from "normal foot action during driving," which ultimately produced the fracture at a point in the valve assembly improperly thin to withstand the anticipated stress, and, in any event, improperly manufactured and tested in that the portion of aluminum which fractured was excessively hydrogenated and could have been detected as such by a standard examination. The expert also stated that, once activated, the air brakes would stop the wheels, and admitted the possibility of momentary braking action prior to failure which might have produced skid marks.

■■■■ General Motors moved for a directed verdict at the conclusion of appellant's evidence. The trial judge granted the motion because there was no evidence for the jury to determine when the fracture occurred. He relied on the absence of evidence that the brakes were ever applied, there being no skid marks at the scene; and the Virginia vehicle inspection one day prior to the accident which found the brakes in satisfactory condition. With the injunction in mind that a directed verdict is proper only when "without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict," Brady v. Southern Ry. Co., 320 U.S. 476, 479, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943), and viewing the evidence most favorably to appellant, who was entitled to every legitimate inference reasonably to be deduced therefrom, Muldrow v. Daly, 117 U.S.App.D.C. 318, 329 F.2d 886, 888 (1964), we find there was sufficient evidence to let the matter proceed at least to the conclusion of General Motors' presentation. And, to the extent that there was conflicting testimony with regard to the cause of the brake failure, it was within the jury's province to resolve. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 700–701, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); Kendall v. Gore Properties, Inc., 98 U.S.App.D.C. 378, 236 F.2d 673, 682 n. 30 (1956).

First, the successful vehicle inspection is not inconsistent with appellant's theory of General Motors' liability. Second, the opinion of appellant's expert and the absence of damage around the brake pedal and floorboard area were clearly enough evidence to support a view that normal foot pressure, and not the collision, caused the fracture of the valve assembly. Finally, there was sufficient evidence which would permit the inference that the decedent did attempt to apply his brakes prior to the collision. Appellant is faced with a difficult burden in establishing this fact since there were no eyewitnesses to the accident. But we believe it to be a fair assumption that, without a showing to the contrary as suggested in note 3, *supra,* decedent as a licensed truck driver would be attentive to his driving responsibilities, would have seen the train ahead of him, at least as it emerged from the obscuring foliage, and would have attempted to stop his truck. This is particularly so in view of the facts that the decedent was familiar with the railroad crossing in question, and had himself once been temporarily stalled on a crossing in the face of an oncoming train, both tending to increase the probability of his attentiveness prior to the fatal collision. We find as well that the absence of skid marks alone does not oper-

ate to withdraw from the realm of reasonable inference the possibility that the decedent did, unsuccessfully, attempt to apply his brakes.[5]

Reversed.

5. In addition to suggesting that properly functioning brakes were not applied, the lack of skid marks just as strongly suggests that brakes that malfunctioned were applied, as appellant's expert witness so attested. While the witness conceded that momentary successful application of the brakes might cause skidding prior to failure, aside from the uncertain effect of a fleeting release of air into the system, it is also possible that the brakes were applied lightly at the curve less than a mile before the crossing. This might have caused a fracture that left decedent wholly without brakes during a later attempt to stop. Regarding the operation of the back-up brake systems, *supra* note 4, it appears to us not improbable that the circumstances would suspend decedent's ability to apply the manual system. The automatic system would not necessarily engage for, as appellant's expert testified, upon failure of the valve assembly the exhaust valve would reseat, merely blocking the passage of pressurized air into the brake system—not permitting an escape of air such as to reduce the pressure below 60 psi as was required to activate the automatic brake.