287 So.2d 192 (1973)
LOU-CON, INC., et al.
v.
GULF BUILDING SERVICES, INC., et al.
AETNA INSURANCE COMPANY
v.
GULF BUILDING SERVICES, INC. and Edmond Harris, Jr.
Nos. 5762, 5763.
Court of Appeal of Louisiana, Fourth Circuit.
November 2, 1973.
On Application for Rehearing January 14, 1974.
Writ Refused March 8, 1974.
*194 Bienvenu & Culver, Robert N. Ryan, and Joseph M. Perry, Jr., Garon & Brener, Trudy H. Oppenheim, New Orleans, for plaintiffs-appellees.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Pat W. Browne, Jr., and John C. Combe, Jr., Dufour, Levy, Marx, Lucas & Osborne, Edwin F. Marx, New Orleans, for defendant-appellant.
Before SCHOTT, J., and ST. AMANT and LeBRUN, JJ., Pro Tem.
SCHOTT, Judge.
Defendants, Gulf Building Services, Inc. (Gulf) and its insurer, Travelers Indemnity Company (Travelers) appeal from a judgment in favor of Lou-Con, Inc. and Piping Equipment Rental, Inc. (Lou-Con) and their subrogated insurers, Royal Insurance Company, Ltd., American Insurance Company, Continental Insurance Company, Home Insurance Company and Aetna Insurance Company, in the total amount of $201,651.09 for damage to Lou-Con's building in St. Bernard Parish, as well as loss of profits suffered by Lou-Con, as a result of fire which occurred on April 27, 1968. Edmund Harris, Jr. was also cast in the judgment but he is not a party to this appeal.
In October, 1967, Lou-Con, an industrial contractor, engaged in piping, boiler making, painting and other related activities, contracted with Gulf which was engaged in providing professional janitorial services to provide such services at Lou-Con's building beginning on November 15, 1967. Negotiations for the services were handled primarily by Mr. Irwin Aucoin for Lou-Con and by Mr. Val Wilson for Gulf, and they culminated in the signing of a written contract which was prepared by Gulf and provided in part as follows:
"We hereby agree to furnish all labor, materials, equipment, and supervision for cleaning premises at 3440 St. Bernard Highway, at the time and in the manner shown on specifications annexed hereto and made part hereof.
"The services shall begin on Nov. 15, 1967, and continue in effect thereafter until cancelled by either party upon sixty (60) days written notice to the other party prior to any proposed cancellation date.
"We agree to assume full responsibility for and will hold you harmless from any and all liability, damage, and expense for injury to or death of any person or loss of or damage or destruction of any property arising out of or resulting from the performance of the services herein agreed to be performed. We carry Statutory Workmen's Compensation Insurance, Public Liability Insurance of One Hundred Thousand ($100,000.00) Dollars, Three Hundred Thousand ($300,000.00) Dollars, Property Damage Insurance of One Hundred Thousand ($100,000.00) Dollars, Two Hundred Thousand ($200,000.00) Dollars, and Ten *195 Thousand ($10,000.00) Dollars Fidelity Bond on our employees.
"Services to be performed three days per week, Monday, Wednesday, and Friday."
The contract then specified the details of the job, such as the care to be provided to the floors, the furniture and various parts of the building. Finally, it contained the provision "Details of Joba. Disposal of trash handled by Lou-Con Placed in appointed place."
There was no mention in the contract of the keys to the building or any other security aspects of the contract which became a major issue at the trial of the case.
On September 12, 1967, defendant, Edmond Harris, Jr., had applied for employment by Gulf as a janitor and began working for them on October 7. On December 11 he began to perform the janitorial service for Gulf at Lou-Con and continued to do so until April 27, 1968, when the fire occurred at the building. He was subsequently convicted of the crime of arson having confessed to willfully setting fire to the building. He had entered the premises on Friday, April 26, for the purpose of performing the services required of Gulf under the contract, at that time stole some cash from a desk, on the following night re-entered the building to steal more cash from the desk and then set the fire in order to cover up the theft.
At the trial of the case parol evidence was admitted in the form of testimony by Mr. Aucoin and Messrs. Joseph Wendling and Bernard Lyons, President and Vice President respectively of Lou-Con, over the objection of Gulf and Travelers to the effect that when the contract was negotiated there was a definite understanding between the parties that the keys to the building would not be provided to the janitor or janitors performing the services but that the keys would remain in the possession of Gulf's supervisory personnel. While the testimony of Messrs. Wendling and Lyons was to the effect that their principal concern was for the security of their trade secrets, such as bids they were preparing on jobs and methods they used in the performance of work for their own customers, Mr. Aucoin stated that "Our concern was, naturally, for the safe keeping of our company office supplies and so forth, office equipment and money, . . . . ." Gulf's representative, Mr. Wilson, could not remember any such conversation concerning the keys and Gulf attempted to rebut the testimony of Lou-Con's witnesses by the introduction of the work sheet used by Wilson when he originally surveyed the job and discussed same with Lou-Con's people, which work sheet contained a section under "Details of Job," a number of items including "a. Disposal of trash handled by _____ Placed _____" completed with the insertion of the words "Lou-Con" and "in appointed place," but with the other details including "e. Keys _____" left without any insertion whatsoever. Wilson's testimony, though vague, was to the effect that had any such discussion about the keys occurred the point would have been noted in that appropriate place in his work sheet.
Following execution of the contract, delivery of the keys to Gulf, and delegation of the janitorial duties to Harris, keys to Lou-Con's premises were given by Gulf to Harris without any restriction except that he was supposed to use the keys for performance of the services agreed to on Monday, Wednesday and Friday evenings after working hours, subject to supervision by a route supervisor, Henry Byrd, who had responsibility for the Lou-Con contract along with 25 or 30 other such contracts covering premises over a wide area of downtown Orleans Parish and Lou-Con in St. Bernard Parish. Harris was serving three or four other customers like Lou-Con and he did so by admitting himself to the premises involved, using the keys provided to him and making his own schedule for the performance of the work after normal working hours unaccompanied by any other Gulf employees.
*196 Supervision consisted of spot checking Harris' work by Byrd's visiting the premises of one customer or the other being served by Harris, on different days and at different times, so that Harris would not be able to anticipate Byrd's presence at any given time. Lou-Con's witnesses testified that on various occasions they registered complaints with Gulf as to deficiencies in the service and that these complaints were at times rectified on the nights intervening between Mondays, Wednesdays and Fridays, including Saturdays.
Plaintiffs' cause of action sounds in tort upon allegations that Harris' act was committed while in the course and scope of his employment by Gulf making Gulf vicariously liable, and upon negligence on the part of Gulf in the initial hiring and subsequent utilization of Harris who had a criminal record of a conviction of a crime involving moral turpitude, in failing properly to supervise Harris and in permitting Harris to have unlimited access to Lou-Con's building. In addition, plaintiffs allege that Gulf's failure to supervise Harris constituted a breach of contract between the parties, and finally plaintiffs base their claim on the indemnification and hold harmless provisions of Gulf's contract with them.
Not being favored with the trial judge's reasons for his judgment, we do not know on which of these theories he found Gulf to be liable. Defendants specify error not only as to the liability issue but also as to the amount of the award, strenuously contending that it is not supported by the evidence. Between Travelers and Gulf also exists the issue of the extent of insurance coverage afforded by the one to the other.
Thus, the questions to be resolved by us are: 1) Is Gulf liable to plaintiffs in tort? 2) Is Gulf liable to plaintiffs for breach of contract? 3) Is Gulf liable to plaintiffs under the indemnification and hold harmless aspects of the contract? 4) If there is liability, for what amount is Gulf liable to plaintiffs? 5) If Gulf is liable to plaintiffs, to what extent is Travelers liable along with Gulf?

IS GULF LIABLE TO PLAINTIFFS IN TORT?
The basic law of Louisiana is found in LSA-C.C. Arts. 2317 and 2320:
2317. "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
2320. "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed. . . ."
"In the above cases, responsibility only attaches, when the masters or employers, teachers and artisans, might have prevented the act which caused the damage, and have not done it."
Thus, we must first determine whether on the night of Saturday, April 27, when Harris willfully set fire to plaintiffs' building he was "in the exercise of the functions in which (he was) employed" by Gulf, or stated differently, whether Harris at that time was acting in the course and scope of his employment by Gulf so as to make Gulf vicariously liable for his criminal act under the doctrine of respondeat superior. The question must be answered in the negative in the light of cases such as Le Brane v. Lewis, 280 So.2d 572 (La. App.1st Cir. 1973) and Bradley v. Humble Oil & Refining Company, 163 So.2d 180 (La.App.4th Cir. 1964), writ refused 246 La. 587, 165 So.2d 483.
In the Bradley case, this Court denied recovery to defendant's customer who was the victim of an intentional tort by defendant's service station attendant, holding that "no vicarious liability will attach in such a case unless the employee acts within the *197 ambit of his assigned duties and also in furtherance of his employer's objectives." Recognizing that an employer is liable for an intentional tort committed by an employee as part of his assigned duties and in furtherance of his employer's duties, this Court concluded that such was not the case in Bradley:
"The duties of a service station attendant are to service the automobiles patronizing the station and to perform any other manual task assigned to him by his immediate superior. He is not employed to police the station, nor is the perpetration of practical jokes part of his work.
"In view of what we have said hereinabove, we are of the opinion that the station attendant was employed to serve automobiles and not to hose customers thereof with gasoline, and for this compelling reason we are convinced that his actions were not within the scope of his employment."
Likewise, in the instant case, there is no basis for imposing vicarious liability on Gulf for the act of criminal arson committed by Harris under the doctrine of respondeat superior.
But Lou-Con also contends that Gulf was negligent in hiring Harris and providing to him access to its premises when it knew, or should have known, that Harris had a criminal record of a conviction of a crime involving moral turpitude. Lou-Con argues that it was foreseeable under those circumstances that Harris would commit a theft, and further that the arson was a part of the theft since it was committed to cover up that theft.
The evidence shows that Harris originally secured a form for his application for employment by Gulf from a friend and with the assistance of his wife completed that form which was sent in to Gulf's office for consideration. Gulf was impressed with the manner in which the form was completed (neatly typed) as well as the contents of the application which included that he had an 8th grade education, owned an automobile on which he had liability insurance and held a full-time job as a laborer. In March, 1968, Gulf obtained from the records room of the New Orleans Police Department a check on Harris, along with a number of other of Gulf's employees, which disclosed no criminal record for Harris within the City of New Orleans. However, Lou-Con showed at the trial that on July 25, 1962, Harris had been convicted on his plea of guilty in the United States District Court for the Eastern District of Louisiana for possession of stolen mail in violation of 18 U.S.C.A. § 1708 and was given a suspended sentence and probation for a period of five years. It is on the basis of this conviction that Lou-Con charges Gulf with actionable negligence in hiring Harris and utilizing his services.
Plaintiffs pose the following question for our consideration: "How can defendants be heard to say that they had no duty to check the criminal background of Harris when the President and Personnel Manager of Gulf recognized that they had such a duty, would not have hired Harris if they knew of his criminal past, and asked their customers to trust Gulf to put honest employees into their locked buildings?"
Answering their own question, plaintiffs do not cite any Louisiana cases dealing with the precise problem, but point to jurisprudence in other jurisdictions as authority for the rule that employers hiring people such as janitors, or for positions which allow employees into customers' or tenants' premises, must use reasonable care in checking their criminal background before hiring them.
For example, in Kendall v. Gore Properties, Inc., 1956, 98 U.S.App.D.C. 378, 236 F.2d 673, the Court reversed a directed verdict in favor of the owner and manager of an apartment house who employed a painter off the street with no investigation of his background whatsoever to paint the *198 apartment of a female tenant. On the day after his employment the painter murdered the tenant, and it was learned thereafter that the painter was a person of unsound mind, was dangerous and irresponsible, and had been previously committed to a ward for insane criminals. Holding that a landlord may not disregard elemental precautions and make no inquiry whatever concerning an employee who is to work in apartments, the Court held that such a landlord may be liable if he knows or in the exercise of ordinary care ought to know of a possibly dangerous situation and fails to take such steps as an ordinarily prudent person in the light of existing circumstances would have exercised in order to avoid injury to the tenant. But significantly, the Court made the following distinction between the Kendall case and Argonne Apartment House Co. v. Garrison, 1930, 59 App.D.C. 370, 42 F.2d 605, previously decided by the same Court:
"Appellee here urges upon us as controlling, a dictum to be found in the Argonne case which reads: `There was no evidence to show that a further investigation would have disclosed sufficient facts to put the defendant on notice as to the dishonesty of Johnson.' The fact had been developed that Johnson, some four years earlier, had been convicted of intoxication. The dictum must be understood to mean that a conviction of intoxication does not suggest that a person so convicted was dishonest. We continued:
'* * * even though the employer had knowledge that an employee had been convicted of such a charge, that would not in itself put the employer on notice as to the dishonesty of such employee.' In any event, in the instant case the evidence is uncontradicted that the appellees made no investigation whatever. As we have already remarked, particular conduct, depending upon circumstances, gives rise to the duty, just as in Medes v. Hornbach, 56 App.D.C. 13, 6 F.2d 711, where we said:
'It is the duty in general of one operating a garage in which automobiles are kept in storage for pay to exercise ordinary care by the employment of trustworthy servants and otherwise for the safe-keeping of the cars in his charge.'"
Also, in support of their position plaintiffs cite several New York cases in which persons employed by landlords as janitors or painters committed thefts from tenants' premises and in which the landlords were held liable on the theory that a landlord is bound to exercise the care which a reasonable man would exercise before employing a person in a position where he would have an opportunity to commit theft.
More recently this theory was applied in that jurisdiction in Weiss v. Furniture In the Raw, 62 Misc.2d 283, 306 N.Y.S.2d 253. Holding that a furniture store which gave its driver authority to hire help off the street when necessary for delivery was negligent through its employee driver in hiring an unidentified teenager to assist in moving furniture into plaintiff's apartment in which the teenager stole the wallet of plaintiff while making delivery rendering the store liable to plaintiff for his loss, the Court said:
"Under the circumstances, the hiring at random `off the street' should have alerted the employer of the possibility that such an unidentified, untrained and untried employee could foreseeably become the perpetrator of an incident such as we have in this case or some other actionable misconduct. The very minimum of hiring standards were not imposed. Proper safeguards were not taken to insure the proper functioning of such a sub-employee, and thus the employer invites the consequences of such foreseeable negligence. Citing Restatement of the Law of Agency 2d, § 213.
We recognize and adopt the rule that an employer who hires an employee who in the performance of his duties will *199 have a unique opportunity to commit a crime against a third party has the duty to exercise reasonable care in the selection of the employee. But we perceive from the cases considered that the question of whether reasonable care was exercised in each case is the difficult one to resolve and the one which will depend on the facts and circumstances of the case. In the instant case, Gulf did not hire Harris "off the street" but had an application from him which, on its face, was better than average. The check on Harris with the New Orleans Police Department followed a practice which had worked successfully in the operation of Gulf's business in checking its employees who, at the time of the trial, numbered between 550 and 600 employees. While it is true that some additional checking might have disclosed Harris' previous conviction and while there is evidence that Gulf's expenditure of only 25 cents per name in its checking compared unfavorably with a figure of $2.60 per name spent by some other employers in Gulf's type of business throughout the country, the fact remains that no amount of checking will be perfect and there is no limit on the amount of checking which could be done. Gulf's checking procedure in this case was reasonable in the light of the application it had from Harris, its experience with other applicants and the fact that Harris was being hired as a janitor and not in some more sensitive capacity. Furthermore, it is significant that at the time of the arson Gulf had more than the mere application from Harris to consider but also had a satisfactory employment record over a 4-month period as testified to by the route supervisor, Byrd, who had almost daily contact with Harris. He regarded Harris before April 27 as an "exceptional worker, a good janitor." He answered in the negative the question as to whether there was "any indication of Harris' being unstable?" before the fire.
Finally, even if Gulf had discovered the previous conviction record against Harris of his acting in concert with others in stealing welfare checks over five years before the date of his employment, it does not follow that it was reasonably foreseeable that such a man would commit the terrible crime of arson which was committed by Harris. Perhaps under such circumstances Gulf could reasonably foresee and become liable for theft but not arson and it seems that the parties themselves must have originally contemplated the possibility of something going awry leading them to include the indemnification and hold harmless paragraph in the contract.
On the issue of tort liability plaintiffs also cite and rely upon Yoars v. New Orleans Linen Supply Company, 185 So. 525 (La.App.2nd Cir. 1938) which gave approval to the following proposition found in Restatement of the Law of Agency 2d, § 261: "A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."
Plaintiffs contend that Gulf should be held liable here as in Stone & Webster Engineering Corp. v. Hamilton National Bank, 6 Cir., 199 F.2d 127, in which the Court held as follows: "Undeniably, the theft in question was made possible by the nature of Bales employment with Stone & Webster. He was permitted behind the teller's cage for the reason that he appeared to be acting in the ordinary course of business entrusted to him by his employer, and was thus enabled to steal from the bank."
This same section of the Restatement of Agency was relied upon in Lucas v. Liggett & Myers Tobacco Company, 50 Haw. 477, 506, 422 P.2d 460 (Hawaii) in which a tobacco company was held liable for the fraud committed by its agent who had freedom of access to the company's rack in a supermarket and who utilized that freedom of access to work a fraud on the supermarket owner.
But, the section of the Restatement which was under discussion in these cases *200 must be read in connection with Sec. 231 of the Restatement which provides as follows:
"The fact that the servant intends a crime, especially if the crime is of some magnitude, is considered in determining whether or not the act is within the employment, since the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result. The master can reasonably anticipate that servants may commit minor crimes in the prosecution of the business, but serious crimes are not only unexpectable but in general are in nature different from what servants in a lawful occupation are expected to do."
In the application of this section we hold that Harris' freedom of access to the building of plaintiffs does not form a basis for tort liability on the part of Gulf because it was not foreseeable that Harris would commit the crime of arson simply because he had the keys in his possession and could gain access to the building.

IS GULF LIABLE TO PLAINTIFFS FOR BREACH OF CONTRACT?
Restatement of the Law of Agency 2d, § 214 provides as follows:
"Unless one has directed a specified tortious act or result, or has been negligent, he is normally not responsible for the conduct of others, except that of his servants or agents acting within the scope of their employment. By contract, however, or by entering into certain relations with others, a person may become responsible for harm caused to them by the conduct of his agents or servants not within the scope of employment; the extent of this liability depends upon the duty assumed."
It is Lou-Con's contention that Gulf assumed in its contract a duty encompassing the safeguard over the keys entrusted to Gulf to the extent that Harris should not have had the keys in his possession so as to make it possible for him to enter Lou-Con's premises on the night of the fire and perform with ease the act which caused Lou-Con's damage.
At the trial, Gulf's objection to the parol evidence in the form of testimony by Lou-Con's officers concerning the keys was properly overruled by the trial judge.
While parol evidence is inadmissible to alter the terms of a written agreement, where there are ambiguities in a written contract such evidence is admissible to clarify the ambiguities by showing the intention of the parties. LSA-C.C. Art. 2276; Snow-White Roofs, Inc. v. Boucher, 182 So.2d 846 (Ct.App.4th Cir. 1966). The word "supervision" in the contract under consideration is ambiguous to the extent that testimony was admissible in order to show what was the intention of the parties when they incorporated that word into their written contract.
But a review of the record convinces us that while Lou-Con expected the "supervision" called for in the contract to include some security over the keys to the building and to preclude an indiscriminate distribution of Lou-Con's keys to Gulf's employees, the supervision intended was not so strict as to eliminate completely the possibility that the janitor might alone gain access to the building.
We are persuaded to some extent by the testimony of the President of Lou-Con to the effect that on the night before this fire he was still in the building when Harris came in to do the cleaning. He was under the impression that Harris was the Janitor and recalled that Harris was unaccompanied by anyone. Far be it from being concerned about or intimidated by Harris' presence, he invited Harris to have a beer from the company's refrigerator and left while Harris continued to perform his duties. This curious circumstances does not lead to a conclusion that Lou-Con knew *201 that Harris had the unrestricted use of the keys since it does not dispell in the Lou-Con executive's mind the possibility that Harris had been admitted to the premises by a supervisor or even that a supervisor might have been on the premises but in another part of the building at the time, but it does tend to show that not even Lou-Con's executives thought that the janitor would at all times perform his duties under the surveillance of a supervisor.
We are also influenced by Gulf's testimony to the effect that some of their customers, such as the F.B.I., would not permit Gulf to perform its services unless the F.B.I's own personnel were present at the time and that in Schwegmann's Retail Super Market, Gulf's personnel were admitted by Schwegmann's guard who was on duty the entire time Gulf's services were performed. The implication follows that the only way maximum security could ever be attained by Gulf's customers would be for the customers' employees to oversee the janitors, and no such precautions were contracted for between Gulf and Lou-Con. Once Lou-Con gave up its keys to Gulf it must have concluded that no amount of supervision except constant surveillance would preclude every possibility of trespass by Gulf's personnel, but we do not find from the testimony that such constant surveillance was intended by these parties in the use of that word "supervision" in the contract. Therefore, we do not find that plaintiffs are entitled to recover on the basis of a breach of the contractual obligation of supervision undertaken by Gulf.
On the other hand, we find that Gulf is liable to Lou-Con based upon the indemnification and hold harmless paragraph of the contract.
Gulf's contention is that the assumption of responsibility and the holding harmless was for damage to Lou-Con's property only "arising out of or resulting from the performance of the services herein agreed to be performed," and since Harris was not performing services when he entered Lou-Con's premises on Saturday, April 27, to steal from Lou-Con and burn down its building Gulf has no liability under that clause.
We find no Louisiana cases which define "arising out of" except cases which deal with Workmen's Compensation. Such cases are inapposite since the rules of construction involved in Workmen's Compensation statutes are different from the rules of construction involved in indemnification provisions. Therefore, we have looked at other authorities in order to determine the meaning of the phrase "arising out of." In 6 C.J.S. Arise 1973 P.P. it is said that this phrase is very broad, general and comprehensive, and is ordinarily understood to mean "originating from," "having its origin in," "growing out of" or "flowing from." When these definitions are substituted for "arising out of" the performance of the services contracted for by Gulf the conclusion is easily reached that Gulf is liable under the terms of the agreement. Certainly, the damage to Lou-Con's building originated from and had its origin in, grew out of or flowed from the fact that Harris while performing the services had become familiar with the building and since he had the keys could walk into the building on a Saturday night and plan and execute his crime. The two phrases of the contract "arising out of" and "resulting from" are not synonymous and each must be given effect. By the use of the words "arising out of" a broader and more extensive risk was undertaken by Gulf than would have been the case had the contract contained only the phrase "resulting from" the performance of the work under the contract.
Finally, the law is settled to the effect that the words of a contract should be interpreted in the light of the obvious and clear intention of the parties at the time they signed the agreement. These parties intended that Lou-Con would allow Gulf to send on its premises in the dead of night one or more persons of the normal education, training and experience, of the type *202 of employees who perform janitorial services. Unless it was intended that the indemnification agreement was broad and all-encompassing it is difficult to believe that Lou-Con would have accepted such services or that Gulf could have sold such to a customer such as Lou-Con. It is especially significant that in the itemization of its insurance coverage within the context of the indemnification and hold harmless paragraph of the contract, Gulf included mention of the "Ten Thousand ($10,000.00) Dollars Fidelity Bond on our employees," leaving the impression that the parties themselves anticipated the possibility of theft and related their indemnification agreement to the existence of the fidelity bond on the employees who would be used by Gulf in the performance of their services.

FOR WHAT AMOUNT IS GULF LIABLE TO PLAINTIFFS?
The direct damage to the property of Lou-Con was fixed at $114,910.03, allocated among the subrogated insurers and Lou-Con for its co-insurance portion in the amount of $27,168.42. There is no real dispute as to this portion of the amount of the damages. There is a dispute, however, over the award to Lou-Con for loss of profits in the amount of $86,741.06, and the question for us is whether there is sufficient proof in the record to support the trial judge's award to Lou-Con of this amount.
Just a few days prior to the fire Lou-Con's forces had embarked upon two large contracts with the Shell Oil Company. As a result of the fire, which was so extensive and hot that the entire roof of the building at the St. Bernard plant fell in, work at the shop was disrupted completely, all electrical power was out for six weeks, full production at the shop could not resume for three months, and the plan for execution of the shell jobs was seriously disrupted. Two Lou-Con foremen testified that the Shell job would have taken approximately three months had it been possible to proceed as originally planned, but instead it required from five to six months for completion. Lou-Con's claim for loss of profits and business interruption expense centered around these projects and the trial judge's award of $86,741.06 was based upon an estimate of losses on these jobs prepared by Lou-Con's certified public accountant.
Several conclusions can readily be drawn from the record of this case: 1) When the fire occurred Lou-Con was actively and busily engaged in a profitable on-going business, 2) as a result of the fire Lou-Con's operations were drastically and severely interrupted, 3) at the time of the fire Lou-Con's attention was focused primarily on the performance of the Shell Oil Company contracts, 4) the direct costs incurred by Lou-Con on the Shell Oil Company contracts were necessarily higher than they would have been had there been no fire, and 5) any profit which Lou-Con would have made on the Shell Oil contracts without the fire was necessarily reduced as a direct result of the fire. Therefore, it was reasonable for the trial judge to assess damages on the basis of Shell Oil contracts.
The accountant testified that he was unable to arrive at the exact amount of Lou-Con's loss and prepared two approaches to the Shell jobs for the Court's consideration of the problem. He explained that the ideal approach would have been to compare the actual direct costs on these jobs with the costs originally anticipated when the jobs were bid, but since Lou-Con's original work sheets and bid were destroyed in the fire he could only estimate the loss by comparison with the company's past history in one approach and by comparison with a similar job in the other approach.
In the first approach, from the contract price for the Shell jobs of $742,776.55 was deducted direct labor and material costs of $609,655.75 resulting in a gross profit of $133,120.80. From this was deducted a figure of overhead expenses consisting of *203 other contract costs, selling and administrative expenses, computed at 26.4% of the contract price on the two jobs which the accountant testified was the average for the five preceding years or $196,093.01. This left an excess of direct costs and overhead expenses over the contract price in the amount of $62,972.21. To this loss figure was added loss of profit computed to be 5.78% of the contract price based upon the average percentage of profits before tax in relation to contract prices for Lou-Con's five previous fiscal years of $42,932.48. The result was an estimated loss on the Shell Oil jobs of $105,904.69.
The other approach was by comparison of the Shell Oil jobs with a similar job done for Williams, McWilliams Company in fiscal year 1967-1968. Gross profit of $48,718.68 on the Williams, McWilliams job was arrived at by deducting from the contract price of $164,655.29 the direct costs of $115,936.61. From the gross profit were deducted overhead expenses of 27% (which was the percentage of Lou-Con's overhead on all operations for fiscal year 1968-1969) resulting in net profit of $4,261.75 or 2.6% of the contract price. Using this same approach to the Shell Oil jobs, from the gross profit of $133,120.80, as arrived at in the first approach discussed above, were deducted overhead expenses of 27% of the contract price or $200,549.67 with the result of a loss on the Shell jobs of $67,428.87. To this loss was added the loss of profit as on the Williams, McWilliams job of 2.6% of the contract price on the Shell jobs in the amount of $19,312.19 for a total actual loss on the Shell jobs of $86,741.06.
Defendants contend that the award by the trial judge of the last named figure constituted speculation. They cite well established principles that awards for damage must be supported by evidence and cannot be based on speculation and conjecture. On the other hand, the law is also clear to the effect that where damages cannot be precisely and mathematically determined the trial judge is vested with reasonable discretion in making awards of damage. Peoples Moss Gin Co., Inc. v. Jenkins, 270 So.2d 285 (La.App.3rd Cir. 1972); Bergeron v. Con-Plex, Inc., 255 So.2d 397 (La.App.1st Cir. 1971); Zesiger v. Dean, 247 So.2d 222 (La.App.4th Cir. 1971).
For example, as to the first computation, defendants take exception to the reduction of the gross profit figure by 26.4% for overhead expenses based on the average for the five preceding years. They contend that much of these overhead expenses include fixed expenses which would not be as great in proportion to a large contract such as the Shell jobs as they would be in proportion to a smaller job. But the accountant's schedule shows that this percentage of overhead was fairly consistent, ranging between 24% in 1964 and 30.7% in 1968. While it cannot be maintained that the 26.4% average is a mathematically accurate figure for the Shell Oil jobs, the evidence does reflect that this figure was within the realm of probability. Likewise, the loss of profit computed at 5.78% in the first Shell Oil computation is attacked because of the wide range this figure of profit took over the 5-year period between 2.45% in 1968 and 9.91% in 1966. Undoubtedly if the percentage of profit was taken for the last previous year, 2.45% or, as defendants contend, if some arbitrary percentage were taken, such as 3.9% based on the two years which were closer to the average, namely, 1964 (5.49%) and 1968, a lower loss of profit would be the result, but defendants have pointed to nothing in the record which would make such a lower percentage more probable than the average of 5.78% taken by the accountant. Even so, these objections are leveled primarily against the first computation which the trial judge in his discretion did not accept.
The real issue to be resolved is whether the trial judge's acceptance of the second method of computation, the comparison between the Shell jobs and the Williams, McWilliams job, constituted an abuse of discretion on his part. They contend first *204 of all that the deduction of 27% of the contract price for overhead expenses is unjustified, but in reviewing the account's testimony we are satisfied that this figure to cover fixed expenses, including selling and administrative expenses of the business, was in accordance with the good accounting practice and is certainly within that same general range of overhead expenses which this company had experienced over its five previous fiscal years. Concerning the loss of 2.6% profit in this computation, the testimony of Mr. Virgil Carson, Secretary and Treasurer of Lou-Con, was to the effect that the Williams, McWilliams job was of the same type and was performed around the same time and in the same general area as the Shell Oil jobs, so that there is a sound basis for concluding that the profit on the job would have approximated the same percentage as the previous Williams, McWilliams jobs had it not been for the fire.
We are persuaded in large measure by the fact that the testimony of the two job foremen was unequivocal to the effect that greater direct costs were incurred in the performance of the Shell Oil jobs than would have been had it not been for the fire, and an analysis of the ratio between the direct costs of the Shell Oil jobs to the total contract price shows that this figure was in excess of 82% as compared to approximately 70% on the Williams, McWilliams job, and compared to the fact that direct costs for the five preceding years of Lou-Con's experience never exceeded 71% above their contract price totals. Had the percentage of direct costs on the Shell Oil jobs been equivalent to the percentage which Lou-Con had experienced in all their previous five years those direct costs would have been more than $80,000.00 less than the figure which was actually incurred, and this figure approximates the total amount of damages awarded to Lou-Con for its loss on the jobs.
The difficulty of arriving at Lou-Con's loss in this case graphically demonstrates the reason for our jurisprudence to the effect that the trial judge must be accorded some discretion in making an award such as this one. As defendants point out, depending on who is pushing the pencil, almost any result can be reached with figures and it might be said that there is no limit to the amount of speculation which can be engaged in in order to change those figures, whether to increase or decrease them. No matter what figure had been arrived at by the trial judge either side could contend that there was some speculation involved, but we are not persuaded that the trial judge's award in this case is based substantially on speculation but rather on a sound exercise of his discretion in a reasonable manner and based on accounting principles contained in expert testimony.

TO WHAT EXTENT IS TRAVELERS LIABLE ALONG WITH GULF?
At the time of the loss Gulf was insured by The Travelers Indemnity Company under two policies, one, a "Comprehensive AutomobileGeneral Liability Policy" and the second, a "Comprehensive DDD Policy."
With respect to the first policy, it includes coverage for comprehensive general liability as well as contractual liability with limits under the comprehensive general portion of $100,000.00 for each occurrence and $200,000.00 "aggregate," and under the contractual liability portion of $100,000.00 for each occurrence and $200,000.00 "aggregate." Under the Comprehensive DDD policy the limit of liability for employee dishonesty coverage is $50,000.00.
The trial judge limited the liability of Travelers to $150,000.00, finding Travelers liable under the Comprehensive DDD policy for the $50,000.00 and under the other policy for $100,000.00 but without explanation as to whether this was under the comprehensive general coverage or the contractual liability coverage. It is Gulf's contention that in any event the liability of Travelers should be for the aggregate of $200,000.00 under the comprehensive general *205 liability policy so that with the addition of the $50,000.00 of coverage under the Comprehensive DDD policy the total loss of $201,651.09 would be fully covered by Travelers. Travelers contends that it is not liable under the Comprehensive DDD policy.
Having already found that there is no liability by Gulf based upon negligence, we therefore hold that the comprehensive general portion of the policy is not involved. It was for this reason that the question of Gulf's liability in tort had to be resolved, for if Gulf were liable in tort as well as contract Travelers' coverage would be for at least $100,000.00 under each part of its policy, comprehensive general as well as contractual liability. We are left with the question of whether the contractual liability coverage is limited to the $100,000.00 for each occurrence or whether the aggregate of $200,000.00 is applicable. The policy provides in part as follows under the contractual liability portion:
"The total liability of the company for all damages because of all property damage sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limit of property damage liability stated in the declarations as applicable to `each occurrence.'
"Subject to the above provision respecting `each occurrence,' the total liability of the company for all damages because of all property damage liability stated in the declarations as `aggregate.' Such aggregate limit of liability applies separately with respect to each project away from premises owned by or rented to the named insured."
We see no ambiguity about the quoted language and find that the limit of $100,000.00 for each occurrence applies to the instant case. The occurrence was the setting of the fire by Harris and all of the property damage resulted from that one occurrence. The aggregate would come into play in a situation, for example, where a janitor had committed acts of vandalism on numerous occasions and on different dates since such acts would be separate occurrences, each one of which would be limited to $100,000.00, but the total aggregate of which would be limited to $200,000.00 in order for full coverage to apply.
Piping Equipment Rental, Inc. was awarded judgment by the trial court jointly with Lou-Con, No attempt was made by the trial judge to allocate any portion of the damages between the two plaintiffs or to divide between them the liability of Travelers. But Piping was not a party to the contract for janitorial services and since Travelers' liability is based alone on its contractual liability coverage, Travelers' liability will be restricted to damages suffered by Lou-Con and will not be cast in the judgment with respect to Piping.
Finally, there is the question of whether Travelers is liable under the Comprehensive DDD policy. Under the terms of this policy Gulf is the named and the only insured, and the insuring agreement provides as follows: "I. Loss of Money, Securities, and other property which the insured shall sustain, to an amount not exceeding in the aggregate the amount stated in the Table of Limits of Liability applicable to this Insuring Agreement I, through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others." The policy contains the following "conditions and limitations":
"OWNERSHIP OF PROPERTY: INTERESTS COVERED
"Section 5. The insured property may be owned by the Insured, or held by the Insured in any capacity whether or not the Insured is liable for the loss thereof, or may be property as respects which the Insured is legally liable; . . . . ." (Emphasis supplied)
*206 Gulf cites the Louisiana Direct Action Statute, LSA-R.S. 22:655 as authority for the right of the plaintiffs in this case to sue Travelers under this policy:
"It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons, * * *, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy."
Gulf contends that the above quoted language of Section 5 of the DDD policy has the effect of making the DDD policy a liability policy under the terms of LSA-R.S. 22:6(4), which defines liability insurance as:
"* * * Insurance against the liability of the insured for the death, injury or disability of an employee or other person, and insurance against the liability of the insured for damage to or destruction of another person's property."
But we do not agree with Gulf's contention in this connection. In Section 5 of the policy Travelers does not insure Gulf's liability to Lou-Con for the damage to its building but simply insures Gulf for its own loss in the event of damage to property for which Gulf may be legally liable. A liability policy is written for the benefit of third parties who suffer injury or damage because of the actions of the insured, but this DDD policy does not purport to extend protection or a right of action to anyone except the named insured, Gulf.
Gulf contends that this is merely a question of whether the plaintiffs have the capacity or authority to sue Travelers under the DDD policy; that any objection on the part of Travelers to plaintiffs' right or capacity to sue had to be raised in dilatory exceptions; and since no such dilatory exception was raised in limine Travelers has waived such objection. But this is not a question of the capacity or authority to sue but rather is a question of whether plaintiffs have a cause of action against Travelers under this DDD policy. Although Travelers did not file a formal exception of no cause of action in the trial court in connection with this DDD policy, under the provisions of LSA-C.C.P. Art. 927 the exception of no cause of action may be noticed by the Appellate Court on its own motion and we here deem it appropriate to do so. Consequently, we find that there is no liability on Travelers to plaintiffs under the Comprehensive DDD policy.

DECREE
Accordingly, the judgment of the trial court is amended so that the liability of Travelers Indemnity Company is limited to One Hundred Thousand and No/100 ($100,000.00) Dollars.
That portion of the judgment which is in favor of Piping Equipment Rentals, Inc. as against Travelers Indemnity Company is reversed.
In all other respects the judgment is affirmed.
Each party is to pay its own costs of appeal.
Reversed in part, amended in part and affirmed.

ON APPLICATION FOR REHEARING
PER CURIAM.
Travelers and Gulf have applied for rehearing urging that our original opinion is inconsistent, for if the contract does not provide a basis for liability from Travelers to Piping neither is there any basis for liability from Gulf to Piping or to Piping's subrogated insurers nor from Travelers to the insurers.
*207 Plaintiffs `have likewise applied for a rehearing on the ground among others that the dismissal of the claim of Piping, with respect to Travelers, is error. In support thereof, the following argument is made:
"Piping Equipment Rental, Inc. is a paper corporation owned by the same stockholders as Lou-Con, Inc. The officers are the same. The Business of Piping Equipment Rental, Inc. was done in the name of Lou-Con. Lou-Con was the trade name for Piping Equipment Rental, Inc. Gulf Building Services, Inc. contracted to clean the building, title to which was in the name of either Lou-Con or Piping. Throughout the case, Piping Equipment Rental, Inc. and Lou-Con, Inc. were treated as one entity by both plaintiffs and defendants. The contract, though singed by Mr. Lyons in the name of Lou-Con, Inc., was a contract with the building owner and operator, i.e., Lou-Con, Inc. and Piping Equipment Rental, Inc."
A re-examination of the record convinces us that there is merit to plaintiffs' position.
The original petition itself contains the following allegations which were admitted by Gulf and Travelers in their answer:
"Gulf Building and Gulf Janitorial contracted with Lou-Con and Piping to furnish janitorial services for the building of Lou-Con and Piping located at 3440 East St. Bernard Highway in Meraux, St. Bernard Parish, Louisiana."
At the trial of the case the following stipulations were made between counsel for plaintiffs and defendants:
"It's stipulated by and between plaintiffs and defendants that should judgment be rendered against the defendants, or either of them in this case, that Royal Insurance Company, Limited received forty thousand, six hundred and forty-five dollars and forty-seven cents as prayed for in the petition, and American Insurance Company and Continental Insurance Company in the amount of twenty-seven thousand, one hundred and twenty-five dollars and fifty-five cents."

and
"Court:
Mrs. Openheim, you have a claim for Aetna Insurance Company?
Mr. Brown:
Your Honor, I think we can stipulate to that.
(Off the record discussion.)
Mrs. Oppenheim:
May it please the Court, we stipulate as to the quantum that is prayed for.
Court:
I think that's $6,263.77, is that correct?
Mrs. Oppenheim:
That is correct.
Court:
If I find liability on behalf of the defendants in this case, it's stipulated that I give judgment in that amount."
In brief filed after trial by Gulf and Travelers they make the following statement:
". . .At the trial defendants stipulated the following facts:
(1) That the cash register destroyed in the fire had a value of $6,263.77 and that Aetna insurance Company paid this sum to the plaintiff.

(2) That the total cost of repairing the building and returning it to its prefire state was $94,939.79.
(3) That under the terms of their respective insurance policies with Lou-Con, Inc., Royal Insurance Company Limited paid the sum of $40,645.47 and American Insurance Company paid the sum of $27,125.55."
(emphasis supplied)
*208 Throughout the handling of this case all parties treated Lou-Con and Piping as one entity despite the fact that the contract on its face was with Lou-Con alone. That none of the parties intended to develop an issue out of Lou-Con and Piping being separate entities is also borne out by the fact that evidence which would have been pertinent to the issue was not offered by the parties. For example, copies of the policies of insurance issued by Royal, American, Home and Aetna were not placed in evidence, and therefore we do not know whether Piping alone was the insured as the owner of the building and contents or whether Lou-Con was alone or also insured for some interest in these properties. Significantly, the subrogation receipt to Home Insurance is executed in behalf of Piping and Lou-Con while the one to Aetna is in behalf of Lou-Con and not Piping.
While on the witness stand Mr. Lyons, Vice President of Lou-Con and Secretary Treasurer of Piping, testified as follows:
"Q You mentioned Piping Equipment Rental. What is that?
A It's aI would sayI don't know the legal terms. It's an inter-office organization. It's a corporation that we keep our equipment things in. Loy Con is the corporation company and we incorporate everything under Lou Con, and the business things and property are transferred into Piping Equipment.
Q They are two different corporations?
A Yes.
Q Piping Equipment owns the stock that you have in Lou Con Corporation?
A We are officers in both of them.
Q The same ownership in both corporations?
A Yes, sir.
Q Do you own part of both corporations?
A Yes, sir.
Q How many people own that?
A Three of us.
Q Who is that?
A Virgil Carson, Joseph Wendling and myself."
Mr. Wendling is President of Lou-Con and Vice President of Piping. His testimony on this point was:
"Q Piping Equipment owns the building and the other tangible property there?
A True.
Q And Lou-Con operates the whole thing, is that right?
A That is right.
Q All the same ownership and all the same people?
A True."
From the foregoing it is clear that Lou-Con and Piping were so closely interrelated that they acted as a unit when Gulf contracted to perform its janitorial services. While Lou-Con alone is named in the contract as Gulf's obligee it was the building and its contents which were to be serviced by Gulf and whose loss was being indemnified against. The intention of these parties to that contract in this connection was certainly clear and was unaffected by technicalities of ownership as between Lou-Con and Piping. We conclude that Piping and Lou-Con stand in the same shoes as opposed to Gulf and Travelers and to that extent our original opinion is amended. The decree is therefore amended to read:

DECREE
Accordingly, the judgment of the trial court is amended so that the liability of *209 Travelers Indemnity Company is limited to One Hundred Thousand and No/100 ($100,000.00) Dollars.
In all other respects the judgment is affirmed.
Each party is to pay its own costs of appeal.
Amended in part and affirmed.