409 So.2d 691 (1982)
BLAISE PARKING AND ENTERPRISES CORPORATION
v.
PROJECT SQUARE 221.
No. 12336.
Court of Appeal of Louisiana, Fourth Circuit.
January 12, 1982.
*692 Charles E. McHale, Jr., Charles J. Rivet, New Orleans, for plaintiff-appellee.
A. Morgan Brian, Jr., and James A. Burton, Simon, Peragine, Smith & Redfearn, New Orleans, for defendant-appellant.
Before SCHOTT, GARRISON and KLEES, JJ.
SCHOTT, Judge.
This case is a sequel to Blaise Parking & Enterprise Corporation v. Project, 349 So.2d 387 (La.App. 4th Cir. 1977) writs refused 351 So.2d 178. Having obtained a final declaratory judgment that Project had violated the terms of a lease agreement between the parties, Blaise instituted this action to collect the damages it sustained because of Project's past breaches and attorney fees it incurred. The trial judge awarded Blaise $37,048.06 for damages and $41,209.00 attorney fees. The issues on this appeal are 1) whether a party to a lease who has obtained a declaratory judgment decreeing that the other party has been violating the lease may recover attorney fees incurred in bringing the original action; 2) whether a party may obtain a judgment for damages sustained from acts of the other party found to be violations of the lease in the declaratory judgment; 3) whether evidence to some extent based on speculation is adequate to support some amount of damages; and 4) whether the award for damages, though considerably less than the amount estimated by an economist, was within the discretion of the trial court.
As can be seen in our previous decision, this case involves the lease of a ten level parking garage in a fifty story office building owned by Project in New Orleans. Blaise as lessee was to operate and manage the garage, but Project had the option to lease back parking spaces which it would make available to its tenants on a monthly contract basis. Project ultimately leased back its full quota of spaces, all but 22 of 781 spaces in the garage, but early on problems developed between the parties including the question of "oversell."
*693 This problem stems from the acknowledged fact that while there are a given number of contract parkers in a garage such as this there is never a time when 100% of the space sold to contract parkers is actually used by them. The dispute between the parties was over which could "oversell" the garage. Project brought the dispute to a head when it insisted that Blaise issue to it 53 magnetic cards for entry to and exit from the garage over above the 531 contracts it had, at that time, opted to lease back from Blaise. We previously held that Blaise was entitled to the oversell and Project was not entitled to the extra cards.
Additionally, Project had taken other action which we previously held was in violation of the lease by failing to provide Blaise with the names and addresses of its contract parkers and by painting green and installing signs in an area of the garage in an effort to reserve that area for a special class of contract parkers.
Finally, in the previous case, we reversed Blaise's right to have the trial court fix reasonable attorney fees upon Blaise filing a petition for further declaratory relief under LSA C.C.P. Art. 1878.
Project specifies error in the trial court's awarding Blaise attorney fees based on the prior declaratory judgment action as well as the present action; dismissing Project's alternative claim for an offset of its own attorney fees in the sum of $7,000.00, and dismissing Project's exception of no cause of action to Blaise's claim for damages based on Project's breach of contract. Project also contends that the damages awarded were not supported by the evidence.

ATTORNEY FEES
The contract between the parties provides as follows:
"IN THE EVENT OF DEFAULT by LESSOR or LESSEE pursuant to the terms and provisions of this lease, including the non-payment of any rental, CONTRACT PARKING RENT or otherwise, due by one to the other, the defaulting party shall be responsible to the other for reasonable attorneys' fees in the event such default is not cured within the grace periods herein provided and in the event of any default, other than a default which can be cured by the payment of money, which cannot by its nature be cured within the grace period of thirty (30) days hereinabove provided, such grace period shall be extended provided the obligated party commences to cure such default within said thirty (30) day period and diligently proceeds to its curing thereafter without interruption."
Project first argues that this language does not contemplate attorney fees for type of breaches it committed because the paragraph is located in a part of the lease whose attention is primarily devoted to Project's obligations to pay rent and other charges and to provide insurance coverage. This argument lacks merit. The quoted provision is at the end of a three page section entitled "Default" and was obviously intended as a catch-all for any default.
Project next argues that an award of attorney fees for services performed prior to the declaratory judgment becoming final is inconsistent with the pleadings Blaise filed for declaratory judgment and is inimical to the purpose of a declaratory judgment action. As to the pleadings in the first action, Project's position has some validity. Blaise did not allege that Project was in default but couched its allegations in such terms as "controversies have arisen between the parties;" their "inability ... to resolve ... differences relative to the interpretation of the contracts;" Project's threats "to place [Blaise] in default under the lease contracts;" and a particularization of acts which Project claims to have the right to do and which Blaise has protested.
However, the judgment of the trial court in the previous case as well as this court's previous decision show that the issues of default were tried and led to the conclusion that Project had no right to paint the green spaces, refuse to supply Blaise with the names and addresses of contract parkers *694 and have extra magnetic cards. Regardless of the pleadings the issue of Project's default was tried pursuant to C.C.P. Art. 1154.
The record shows that Blaise repeatedly warned Project that it was in default as required by the quoted default clause from the lease. Early on Blaise demanded the names and addresses of contract parkers as a tool to deal with the problem of multiple egress (to be discussed in detail hereafter). When Project demanded the 53 extra cards, Blaise issued them under protest with the warning that this would cause Blaise to sustain losses. As soon as Blaise discovered that Project had painted and marked off the green area it notified Project of the default and promised action to recover damages. Thus, under the terms of the lease Blaise was entitled to claim attorney fees.
Louisiana's Declaratory Judgment Act found in C.C.P. Arts. 1871 et seq., sanctions an award for attorney fees. Art. 1872 which authorizes the winning party to seek "further relief" when appropriate. Project cites Burton v. Lumbermens Mutual Casualty Co., 152 So.2d 235 (La.App. 4th Cir. 1963), writs refused 244 La. 895, 154 So.2d 767 as authority for the proposition that attorney fees may not be awarded under these circumstances, but the case is clearly to the contrary. There, the court held that attorney fees incurred by Ohio Casualty Company in defending Lumbermens' insured could not be awarded to Ohio in the original declaratory judgment suit brought by the insured pursuant to Art. 1871 against the two insurers but could be awarded in a subsequent action pursuant to Art. 1878.
While our previous decision did not discuss in detail the question of Blaise's entitlement to attorney fees, a fair reading of the case shows that the court was convinced that Art. 1878 conferred on Blaise the right to seek attorney fees in the present case and did establish the law of the case in this regard.
Since the evidence supports the amount of the award of attorney fees to Blaise the only remaining questions on this issue are Blaise's contention that its attorney fees should be increased for the additional fees incurred on appeal and Project's position that it is entitled to an offset of $7,000.00 for attorney fees it incurred.
As to Blaise's position, it has merit. The award below was based on the time spent by the attorneys through the second trial. An increase of $2,500 is appropriate considering the complexity of the issues, the amount of money involved, and other pertinent factors.
Project's argument for the offset is based on the proposition that it "won" in the previous case on a major point at issue when we held that Project was entitled to lease back 759 stalls rather than 532 as Blaise contended. Thus, says Project, it obtained declaratory relief on this point, and its plea for offsetting attorney fees is a claim for further relief under Art. 1878.
The fallacy here is that Blaise committed no default which would provide a basis for an award to Project for attorney fees. When Project exercised its option to take the remaining stalls after it had previously taken 531 Blaise acquiesced, although under protest. Project got the additional stalls and used them. Thus, the evidence does not support Project's entitlement to attorney fees under the provisions of the lease.

ENTITLEMENT TO DAMAGES FOR BREACH OF CONTRACT BY VIRTUE OF DECLARATORY JUDGMENT DECREEING RIGHTS OF PARTIES UNDER CONTRACT
Project raised this issue with an exception of no cause of action. Its position is that Blaise, having obtained a declaratory judgment defining its rights under the lease, is not entitled to damages for Project's breaches of contract occurring before the declaratory judgment became final. Project argues that such a procedure defeats one of the purposes of the declaratory judgment procedure, namely, adjudication of disputes without exposure to damages; and it promotes piecemeal litigation and a loss of judicial economy. Project recognizes *695 that Blaise could have sought damages from the outset and obtained a judicial interpretation as an incident to the suit but contends that Blaise is somehow estopped from claiming damages having elected to seek declaratory relief. Project acknowledges that there is no authority in Louisiana for its position and simply argues that its view is the "better" one.
The starting point for our decision is the language of our Code of Civil Procedure establishing declaratory judgment procedure. Art. 1871 which sets out the scope of declaratory proceedings provides that "the existence of another adequate remedy does not preclude a judgment for declaratory relief" where appropriate. Thus, even though Blaise could have filed a damage suit originally it was not precluded from seeking declaratory relief. But, here, we have the other side of the coin with Project arguing monetary damages. Art. 1878 seems to supply the answer to this contention. It provides:
"Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application therefor shall be by petition to a court having jurisdiction to grant the relief. If the application is considered sufficient, the court, on reasonable notice, shall require any adverse party whose rights have been adjudicated by the declaratory judgment or decree, to show cause why further relief should not be granted forthwith."
Project argues that this article means that a party who has obtained a declaratory judgment may return to court to enforce the provisions of the judgment but that the article does not contemplate a suit for damages sustained by the plaintiff before he obtained a declaratory judgment that the acts causing the damage were illegal or improper. In the first place, the Burton case referred to above in connection with attorney fees implies otherwise when it says:
"While this judgment in determining which insurer is primarily liable, may later form the basis of an action to recover attorney's fees, etc...." (emphasis supplied)
While Project cites no cases from other jurisdictions in support of its argument we are referred to Beacon Const. Co., Inc. v. Matco Electric Co., Inc., 521 F.2d 392 (2 Cir. 1975), Security Insurance Company of New Haven v. White, 236 F.2d 215 (10 Cir. 1956) and Atchison v. City of Englewood, 180 Colo. 407, 506 P.2d 140 (1973), which refute Project's position. In the last case the court considered many of the same arguments advanced by Project here and concluded:
"We reaffirm the rule that a declaratory judgment is conclusive as to the question raised by the parties and passed upon by the court [citation omitted]. A declaratory judgment, however, does not constitute an absolute bar to subsequent proceedings where the parties are seeking other remedies, even though based upon claims which could have been asserted in the original action ..."
Project admits that its position is to some extent dependent on the principle of collateral estopped, but that principle was effectively abrogated in Louisiana in Welch v. Crown Zellerbach Corporation, 359 So.2d 154 (La.1978).
This question is analagous to the one addressed in Giron v. Housing Auth. of City of Opelousas, 393 So.2d 1267 (La.1981) in which the court held that a plaintiff who sues for specific enforcement of a contract is not prohibited from amending his petition to sue for damages for defendant's breach. The court held that there is no requirement that a plaintiff choose irrevocably between remedies and that "the common law election of remedies is inconsistent with the modern procedural concepts embodied in our present Code of Civil Procedure ..."
Project's position is an application of the election of remedies doctrine. It would have us hold that Blaise's failure to seek damages initially and its seeking only a declaratory judgment (with reservation of its right to seek damages later) constituted an irrevocable election of remedies. We conclude, as we did in the previous case, *696 that Project's position is without merit and that Blaise had a cause of action for damages even though it earlier sought only a declaratory judgment and even though such damages were sustained before the declaratory judgment became final.

DAMAGES
In the previous case before us the court reached the following conclusions:
1. Blaise was entitled to the names and addresses of Project's contract parkers.
2. Project was not entitled to 53 extra magnetic cards.
3. Project was not entitled to paint the walls of an area to reserve for classes of contract parkers.
4. Blaise had the right to the exclusive management of the garage (except for the top two floors) without interference from Project.
In the present case the trial court made the following awards in accordance with the above conclusions:

1. For abuses by Project's contract parkers of
 magnetic cards in their possession. $9,000.00
2. For Project's having been issued 53 extra
 magnetic cards. $20,000.00
3. For Project's wrongful painting of 30 green
 spaces on the sixth parking level. $7,000.00
4. General damages for Project's interference with
 Blaise's management (trespass). $1,000.00

Project contends that these awards are unsupported by the evidence while Blaise contends that it is entitled to an increase to the following amounts:

Item 1 $47,238.00
Item 2 106,692.75
Item 3 10,553.25
Item 4 20,000.00

Blaise's evidence consisted of the testimony of its president, Edward J. Soniat, its general manager Bilbert J. Boasso, and an economist, Dr. William Barnett. Project produced as witnesses one of its senior executives, Joseph J. Ranna, and its building manager, Thomas Thornell.
Dr. Barnett produced an extensive and complex set of computations which he felt was the only practical approach to estimate the economic losses sustained by Blaise as a result of Project's violations of the contract. In the previous case, it was established that Blaise and not Project had the right to "oversell: the garage. This means that while Project had received 759 of the 781 parking accommodations available in the garage Blaise could rent to transient parkers those spaces not being used by the contract parkers at any time. However, since every contract parker had an absolute right to a parking place at all times, it was Blaise's obligation to limit transient parking to an appropriate number of spaces out of the 759 spaces contracted for.
According to a parking garage expert who testified in the previous case, an operator like Blaise could anticipate that the number of spaces used by contract parkers at any time would be at least 85% so that the operator could never rent more than 15% of the number of parking contracts represented by magnetic cards issued by Blaise to Project and to use his judgment in limiting the number to less than 15% as conditions dictated.
Thus, Barnett's basic assumption was that of 781 accommodations available in the garage, 150 would be subtracted, because of an arrangement between Project and Shell Oil Company whereby the latter had the exclusive right to the top two floors (this has never been disputed and is not an issue in the case) and 85% of the difference would be further subtracted in order to yield the number of accommodations which should have been available to Blaise for transient parking.
Under the lease between Blaise and Project (discussed in some detail in the previous case before us) Project leased back from Blaise 531 stalls from March 1, 1973, to February 17, 1975, an additional 90 or 621 from February 18 to March 19, 1975, and an additional 138 or 759 (the maximum available) from March 20, 1975. Thus, the number of accommodations which should have been available to Blaise was reduced as Project leased back additional spaces.
*697 Next, Dr. Barnett computed the number of accommodations actually available to Blaise as a result of Project's violations of the lease beginning with the supposed misuse by contract parkers of magnetic cards issued to them by Project. An understanding of this aspect of the computations required an understanding of some basic facts.
Project had the exclusive right to sell contract parking, i.e., the privilege of parking in the garage, at all times and on an in and out basis, for a monthly consideration. As Project leased back from Blaise spaces for contract parking, Blaise issued to Project that number of magnetic cards which Project in turn would assign as the contracts were sold. These cards were numbered by Blaise and were used to enter and exit from the garage in lanes specified for contract parkers. When inserted at the exit a card's number was registered in a computer. A transient parker used a different lane to enter the garage so that he would pull a ticket from a "spitter" and would surrender his ticket to and pay a collector upon exiting. Thus, in theory, every ticket pulled to enter would be returned when the parker exited.
However, almost at the inception, Blaise began to experience "lost" tickets, i.e., tickets pulled but never returned. Boasso counted almost 19,000 lost tickets from March 1, 1973, to December 31, 1977, starting with a daily average of 15.59 and reaching 31.18 in December, 1977. It is Project's theory that these lost tickets were attributable to schemes between contract parkers and parkers who pulled tickets upon entering and borrowed magnetic cards to exit, thus avoiding payment and leaving the tickets unaccounted for.
Dr. Barnett accepted and espoused this theory and deducted the number of lost tickets from the number of parking accommodations which should have been available to Blaise in arriving at the actual number of accommodations available to Blaise.
The next item considered by Dr. Barnett is arriving at the actual number of accommodations available to Blaise as opposed to what should have been available except for Project's misconduct was the issuance of 53 extra magnetic cards by Blaise to Project.
This aspect of the case dates from December 18, 1974, when the extra cards were issued. Previously, Project had gotten 531 cards from Blaise and on November 11, 1974, Project demanded an additional 53 for the express purpose of keeping the 531 stalls filled, thereby deriving the benefit of oversell as to the spaces sold to contract parkers. Blaise issued them on December 18 under protest, and this court, in the previous case, held that Project was not entitled to the 53 cards since Blaise alone was entitled to oversell the garage.
When Barnett computed the accommodations which should have been available to Blaise he deducted from the total number of spaces in the garage 85% of the legitimately and properly issued cards from Blaise to Project. Now, beginning on December 18 the actual number available to Blaise would be further reduced by 85% or 53 or 45.05.
The last element considered by Barnett in arriving at the actual number of accommodations available to Blaise was Project's marking off with green paint some 30 spaces with the notice that the space was available only to contract parkers with green decals on their windshields. By way of explanation, Project had conceived of the idea selling contracts at different rates and reserving more desirable areas in the garage for those willing to pay higher prices. In implementing this program it marked off 30 spaces with green paint on the 6th parking level. In the previous case before us the court held that Project had thereby interfered with Blaise's right to manage the garage in violation of the contract.
It is Blaise's theory that a transient parker looking for a space in the garage would pass up these painted spaces altogether so that the spaces were lost to Blaise as potential for oversell. Barnett figures that whereas Project would ordinarily be entitled to a deduction of 85% if the 30 spaces to arrive at the number of accommodations which should have been available to Blaise, *698 it was now being deprived of an additional 4.5 spaces (15% × 30) and he deducted this to arrive at actual number of accommodations available to Blaise.
The foregoing explanation of the approach taken by Barnett to the three disputed areas is almost sufficient to enable us to reach the issues raised by the parties but fails to include one further point raised in connection with Dr. Barnett's computation. In order to arrive at a dollar loss to Blaise Barnett divided the entire period of time when the violations occurred into nine periods in which all conditions were constant, including the existence of the violations and rates being charged for transient parking. For each period Barnett divided 88% of the total revenue earned by Blaise from transient parking at the garage by the number of daily accommodations actually available to Blaise during the period. This was in turn broken down for each class of violation by Project for each of the nine periods and totaled to the amount Blaise now claims.
Project argues that Blaise fell short of carrying its burden to prove the loss of profits from Project's breach of contract with reasonable certainty and without speculation and conjecture as discussed in Recherche, Inc. v. Jewelry Jungle, Inc., 377 So.2d 1329 (La.App. 1st Cir. 1979). Based on this proposition Project would have this court simply deprive Blaise of any recovery. On the other hand, Blaise argues that Dr. Barnett was the only expert called, his factual assumptions were supported by the evidence and his conclusions were reasonable so the trial court erred in failing to grant recovery for the amounts Barnett computed as Blaise's losses.
As discussed below, Barnett's assumed facts were not proved with legal certainty and were to some extent based on speculation. The evidence furnished the trial court with a basis for concluding that Blaise sustained some loss but not for the amounts Blaise claimed. The trial court was confronted with a myriad of possibilities which emerged from disputed facts, unclear inferences and conflicting theories. He was in the same position as the trial Judge in Lou-Con, Inc. v. Gulf Building Services, Inc., 287 So.2d 192 (La.App. 4th Cir. 1974), writs refused 290 So.2d 899 and 901, where we observed:
"The difficulty of arriving at Lou-Con's loss in this case graphically demonstrates the reason for our jurisprudence to the effect that the trial judge must be accorded some discretion in making an award such as this one... No matter what figure has been arrived at by the trial judge either side could contend that there was some speculation involved, but we are not persuaded that the trial judge's award in this case is based substantially on speculation but rather on a sound exercise of his discretion in a reasonable manner.
As to the damage Blaise claims for multiple egress as evidenced by lost tickets, the trial judge was doubtless influenced by these and perhaps other factors: Just because a magnetic card was used more than once in a day and tickets pulled upon entering were not returned, it does not follow that the cardholders engaged in any wrongdoing. A cardholder could have left his card home in the morning and faced with the choice of getting out of his car and having a hassle with the attendant, he simply pulled a ticket and borrowed a co-worker's card to get out. Barnett's theory that this wouldn't happen often because the average parker would realize he was causing some inconvenience for Blaise constitutes rank speculation. Equally plausible is the theory that the average parker in those circumstances would feel that Blaise was paid for his space and he owed Blaise nothing. This could easily account for a significant number of the lost tickets considering that there were hundreds of contract parkers working in the same building. Surely it was not unusual on each day for a handful of contract parkers out of the hundreds involved to have left cards in other suits, purses, or automobiles or misplaced or forgot them.
Another point the trial judge may have considered is that the remedy suggested by Blaise and requested of Project would not *699 have solved the problem. It is inconceivable that Blaise's attendants, even if provided with the names and addresses of contract parkers, could have somehow prevented the multiple use of cards during the peak exiting hours when hundreds of cars were passing through. The evidence seems clear that Blaise did not and could not correct this problem after they were supplied with the list, and, not until a sophistocated "anti-passback" machine was installed, was the problem solved. This machine did not go on the market until 1978.
Finally, the trial judge must have been impressed with the testimony of Project's witnesses that they got no more than twelve specific complaints about a situation Blaise claims happened 18,700 times.
Project owed Blaise some duty to cooperate and we previously held that this included supplying the list. With the list Blaise could probably have done something to minimize the losses from multiple egress. The trial judge's award of $9,000 out of the $47,238 claimed by Blaise was within his sound discretion.
As to Blaise's claim based on the issuance of the 53 extra cards to Project, the figure claimed by Blaise depends on the theory that Blaise necessarily set aside 85% of the 53, or 45.05 spaces for Project's contract cards which they would otherwise have sold to transient parkers. While we are convinced that Blaise lost something in this connection, we are not persuaded that the trial judge erred in allowing only $20,000 in damages instead of the $106,692.75 claimed by Blaise.
Blaise's figure depends on the assumption that its personnel consistently set aside for contract parkers 85% of the number of contract cards outstanding. While Mr. Soniat instructed Mr. Boasso to do this, a fair reading of the latter's testimony convinces us that, in his day to day management of the garage, he was more concerned with conditions as they actually were when he decided that he could not take on any more transient parkers. In other words, Mr. Soniat's 85% maximum was simply not workable for an experienced garage operator trying to get the most out of the lot financially.
Additionally, Barnett speculated when he assumed that if Blaise was able to fill a certain percentage of spaces while setting aside the 45.05 spaces for Project, the same percentage of occupancy would have prevailed had Blaise been able to sell the 45.05 spaces to transients.
Finally, Ranna and Thornell testified that they often found the garage filled to the extent that only twelve spots were open which would tend to prove that Boasso did not consistently regard the 45.05 spaces as set aside for contract parkers.
The last question is whether the trial judge abused his discretion in awarding Blaise only $7,000 of the $10,553.25 Blaise claimed in connection with Project's wrongful painting of green spaces. We note at the outset that Blaise recovered a greater percentage of the amount claimed for this item than for the others indicating that he was more convinced of the validity of Barnett's assumption in this regard.
It seems clear that many potential transient parkers would have been discouraged from parking in these spaces which were ostensibly reserved for contract parkers so Blaise undoubtedly lost revenue as a result. On the other hand, Ranna and Thornell both testified that they saw some ticketed cars (transients) in the spaces on many occasions which effectively rebutted the theory that Blaise's potential was completely lost in this area.
Finally, Barnett admitted that the only way he could have arrived at an accurate percentage of total revenues attributable to week or work day parking was to make a detailed study of parking revenue during each hour of every day. However, he said that such a study would have been so costly as to be economically unfeasible. Instead, he estimated that Blaise's day time working day revenues amounted to 88%. Perhaps the trial judge was not convinced that this percentage was entirely realistic and exercised his discretion in fixing a lower percentage which was reflected in each of his *700 awards. Once again, we cannot conclude that this was an abuse of his discretion.
Project also complains that the award to Blaise of $1,000 for general damages for trespass was unsupported by the evidence. While Barnett did not include in his report any reference outside of the three areas discussed, there was evidence that Project did, over this four year period, infringe upon Blaise's prerogatives in the garage by distributing leaflets to parkers and establishing a monitoring system. Since Project had no right to engage in such activities they constituted trespassing. When all of the testimony is considered, Blaise suffered some loss for which it is entitled to some compensation. The trial judge's award of $1,000 was minimal and was an exercise of sound discretion considering that the damage could not be assessed with any degree of accuracy.

CONCLUSION
Accordingly, the judgment appealed from is affirmed, but amended to increase the attorney fees to $43,709.00.
AMENDED AND AFFIRMED.